**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 06-cv-

ELIESER YAEL VELÁSQUEZ CATALÁN,
SERGIO VELÁSQUEZ CATALÁN,
HUMBERTO HERALDO BERROCAL ORTIZ,
LUIS ALEJANDRO FUENTES SANDOVAL, and
OSCAR SANDOVAL POBLETE,

     Plaintiffs,

v.

VERMILLION RANCH LIMITED PARTERNSHIP,
A. WRIGHT DICKINSON III,
PAULINE DICKINSON,
DEANN DICKINSON,
T. WRIGHT DICKINSON,
MARC DICKINSON, and
JEAN MARIE DICKINSON.

     Defendants.

---

# COMPLAINT

---

## PRELIMINARY STATEMENT

1.     Plaintiffs are five Chilean cattle herders who came to work in Colorado on visas

procured for them by Defendants.  Plaintiffs agreed to come work on Defendants' ranch

believing that they would have good jobs and earn money to help their families back in Chile.

Defendants, however, controlled Plaintiffs' visas and hence their ability to be lawfully employed

in the United States, and wrongfully used this power to exploit Plaintiffs' working conditions.

Defendants took unusual advantage, controlling Plaintiffs' documents, money, and freedom of

movement, resulting in acts of discrimination against, and sometimes the forced labor of Plaintiffs.

2.      Plaintiffs bring this action to recover damages for injuries inflicted by Defendants under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.,* the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1589 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, the Colorado Wage Statute, Colo. Rev. Stat. § 8-4-101 *et seq.*, and common law claims under Colorado law for breach of contract, false imprisonment, outrageous conduct and promissory estoppel.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337 (commerce), 29 U.S.C. § 216 (FLSA), 18 U.S.C. § 1595 (TVPRA), 18 U.S.C. § 1962 (RICO) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' related claims under Colorado law.

4.      Venue is proper pursuant to 28 U.S.C. § 1391.  A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Colorado and many of the Defendants are residents of Colorado.

## PARTIES

**A.      PLAINTIFFS**

5.      All Plaintiffs are citizens of Chile and were employed by Defendants as temporary foreign agricultural workers on visas which were applied for by Defendants.

6.      Plaintiff Elieser Yael Velásquez Catalán was employed by Vermillion Ranch Limited Partnership from on or around June 3, 2003 through June 14, 2005 within the meaning of 29 U.S.C. § 203(g) and was an employee as defined by Colo. Rev. Stat. § 8-4-101(4).

7.      Plaintiff Sergio Velásquez Catalán was employed by Vermillion Ranch Limited Partnership from on or around April 16, 2004 through June 14, 2005 within the meaning of 29 U.S.C. § 203(g) and was an employee as defined by Colo. Rev. Stat. § 8-4-101(4).

8.      Plaintiff Humberto Heraldo Berrocal Ortiz was employed by Vermillion Ranch Limited Partnership from on or around April 16, 2004 through October 28, 2005 within the meaning of 29 U.S.C. § 203(g).

9.      Plaintiff Luis Alejandro Fuentes Sandoval was employed by Vermillion Ranch Limited Partnership from on or around April 16, 2004 through November 30, 2005 within the meaning of 29 U.S.C. § 203(g).

10.     Plaintiff Oscar Sandoval Poblete was employed by Vermillion Ranch Limited Partnership from July 21, 2005 through November 30, 2005 within the meaning of 29 U.S.C. § 203(g).

**B.      DEFENDANTS**

11.     Defendant Vermillion Ranch Limited Partnership (VRLP) is a limited partnership registered in Wyo. and registered as a foreign partnership in Colorado.  VRLP has a mailing address of 14883 CR 10 N., Maybell, Colorado 81640, and a street address of 609 5th Avenue W., Rock Springs, Wyo. 82901.  At all times pertinent to this action, Defendant VRLP employed Plaintiffs within the meaning of 29 U.S.C. § 203(g) and Colo. Rev. Stat. § 8-4-101(5).

12.     Defendant A. Wright "Wright" Dickinson III is the registered agent for VRLP and resides in Colorado.  Defendant A. Wright Dickinson III is a partner of VRLP.

13.     Defendant Pauline Dickinson resides in Colorado.  Defendant Pauline Dickinson is a partner of VRLP.

14.     Defendant DeAnn "Didi" Dickinson resides in Colorado.  Defendant DeAnn Dickinson is a partner of VRLP.

15.     Defendant T. Wright Dickinson resides in Colorado.  Defendant T. Wright Dickinson is a partner of VRLP.

16.     Defendant Marc Dickinson resides in Wyo.  Defendant Marc Dickinson is a partner of VRLP.

17.     Defendant Jean Marie Dickinson resides in Wyo.  Defendant Jean Dickinson is a partner of VRLP.

18.     Defendants Wright, Pauline, Marc, DeAnn, and T. Wright Dickinson all participate in supervising the individual workers employed by VRLP.  Defendant Jean Dickinson handles the paperwork for VRLP.  Defendants Wright, Pauline, Marc, DeAnn, T. Wright, and Jean Dickinson are hereinafter referred to collectively as the "Dickinson Defendants."

19.     As the partners of VRLP, on information and belief, each of the Dickinson Defendants has power and control over the employment of Plaintiffs.  All of the Dickinson Defendants participate, directly and/or indirectly in hiring, firing, establishing rates and methods of payment, scheduling work shifts, maintaining employment records and setting terms and conditions of employment relating to Plaintiffs.

20.     The Dickinson Defendants employed Plaintiffs within the meaning of 29 U.S.C. § 203(g) and Colo. Rev. Stat. § 8-4-101(5).

## STATEMENT OF FACTS

### A.     RANCHING AND TEMPORARY FOREIGN AGRICULTURAL WORKERS

21.     Defendants own and operate a cattle ranch known as Vermillion Ranch.  The ranch is principally located in northwest Colorado, in Moffat County, but it also extends into Wyo. and Utah.

22.     For at least the past six years, Defendants have acquired a steady supply of Chilean workers to work on their ranch with H-2A visas.

23.     The H-2A program enables employers to hire foreign workers to come to the U.S. to perform temporary agricultural work.  8 U.S.C. § 1188.  The U.S. Department of Labor (U.S. DOL) oversees a regulatory scheme which is supposed to ensure that U.S. workers are given preference over foreign workers for the positions.  To the extent H-2A workers are employed, U.S. DOL also ensures that their employment does not adversely affect the compensation and working conditions of U.S. workers.  *See generally Alfred L. Snapp & Sons, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 594-596 (1982).

24.     The goal of these U.S. DOL regulations is to protect U.S. workers by preventing employers from lowering standards through the employment of foreign workers.  Regulations found at 20 C.F.R. § 655.100 *et seq.* govern the contents of the job offers that must be made to both U.S. and temporary foreign workers.

25.     The regulations stipulate certain benefits that must be included in the job offer, including, but not limited to: (a) transportation and subsistence expenses to and from the

worker's home; (b) the prevailing wage, the adverse effect wage rate or the legal federal or state minimum wage rate, whichever is highest; and (c) coverage by workers' compensation insurance.  20 C.F.R. § 655.102.

26.     As a part of the job offers for all H-2A workers, employers must attest that they will abide by the assurances in 20 C.F.R. § 655.103.  Such assurances include a promise to comply with applicable federal, state, and local employment-related laws and regulations.

27.     As a special subset of the H-2A program, those employers who are seeking workers for the range production of livestock are exempt from certain requirements.  20 CFR § 655.93(b) and (c).  U.S. DOL has issued special guidance which it applies only in the case of H-2A applications with job offers requesting workers for the range production of livestock.  U.S. DOL Field Memo 24-01 (Aug. 1, 2001).

28.     Employers hiring workers for the range production of livestock, for example, are subject to certain exceptions, including: (a) housing that only needs to meet the standards for "range housing;" (b) the ability to negotiate a longer-term contract of up to three years; and (c) upon mutual agreement between employer and employee, the payment of wages monthly instead of bi-monthly.  *Id.*

29.     Employers who hire H-2A workers in the range production of livestock are able to pay a wage that is dramatically lower than for other agricultural work, though such employers are required to provide food that is free of cost.  *Id.*; 20 C.F.R. § 655.102(b)(9).  In Colorado, for example, the minimum monthly wage for those performing range production of livestock was $750 per month since June 2005, while the minimum hourly wage for other agricultural workers on H-2A visas was $8.93 per hour in 2005.

30.     All H-2A job offers are incorporated by regulation and by operation of law into the contracts under which workers are employed.  29 C.F.R. § 501.10(d); 20 C.F.R. § 655.102(b)(14).

**B.     DEFENDANTS' SYSTEM OF EXPLOITATION AND CONTROL**

31.     All of Defendants' H-2A workers are from Chile and seek to come to the U.S. as H-2A workers because of acute economic need.  These H-2A workers use their wages for basic needs such as support for their families and the education of their children.

32.     Workers rarely if ever have been to the U.S. before and do not speak English. Workers, being from a different hemisphere, are unfamiliar with the laws and customs in the U.S.  Due to their vastly different lifestyle in Chile, for example, the majority of Defendants' H-2A workers do not know how to drive an automobile.

33.     Defendants' strategy has been to completely and systematically dominate these workers by preying on their temporary immigration status and economic vulnerability.

34.     Defendants apply for H-2A visas under the special subset of H-2A visas available for workers performing the range production of livestock.

35.     Defendants, through the local recruiter Victor Tocanini, recruit workers from Chile, South America, promising them work for three years.

36.     Workers in Chile, such as Plaintiffs, often accept this H-2A employment with Defendants because they are deceived about the work and the terms and conditions of employment.

37.     Once the workers have accepted, Defendants obtain H-2A visas for the workers. Defendants also enter into employment contracts with the workers.

38.     Upon arrival to the U.S., workers, such as the Plaintiffs, find out that the working conditions are dramatically different from what was promised.

39.     Defendants confiscate the workers' social security cards, passports, visas, and departure records (I-94 Forms) from their possession.

40.     Defendants do not pay the workers in any kind of negotiable instrument or cash that the workers can access.  Instead, Defendants provide each worker with a monthly pay statement, showing the monthly earnings and deductions.  During some months, due to the deductions, workers have negative balances, meaning that rather than earning wages, they end the month owing money to the Defendants.

41.     If the worker has a positive balance on the monthly pay statement, Defendants deposit this money into a bank account which the worker cannot access.  Workers have no bank documents, account numbers, or access to their passports or other identification which would allow them to access their accounts.

42.     Workers cannot send money to their families in Chile without the permission and the assistance of the Dickinson Defendants.

43.     Furthermore, Vermillion Ranch is vast and in an isolated location and the workers have no access to transportation, telephone service or mail service unless provided by the Dickinson Defendants.

44.     Once the workers are taken to their housing on the ranch, their freedom of movement is restricted.

45.     The Dickinson Defendants tell each worker that he may not leave his housing and surrounding work area, nor visit any other workers during his free time.  This rule applies even

when a worker has no job duties that would require him to be present near his work area on a standby basis.

46.     Many of the Defendants' H-2A workers primarily perform duties that are neither on the range nor production of livestock, the tasks for which these visas were intended.  These other tasks include, but are not limited to, breaking wild horses, cutting posts in the forest for the construction of corrals, driving heavy machinery, mechanical work, harvesting cultivated fields, and building a landscaped flower bed and planting flowers for a personal residence of the Dickinson Defendants.

47.     Defendants require the workers to work seven days per week, ten to sixteen hours per day, even during those periods when workers have set schedules and are not performing tasks that require them to be on call 24 hours a day.  Defendants give the workers no day off, except for less than a half-day rest on Christmas day each year.  For this work, workers are paid $800 per month, before any deductions are taken.

48.     From time to time, the Dickinson Defendants wrongfully threaten workers that they will be sent back to Chile.

49.     Workers believe that if they are sent back to Chile in this manner, they will probably never be able to come back as an H-2A worker to the U.S., even with a different employer.

50.     Defendants, therefore, accomplish their strategy of establishing and maintaining total domination of H-2A workers through a system of controls which deprives the workers, such as Plaintiffs, of their rights under federal, state, and local employment-related laws and regulations.

**C.** **PLAINTIFFS**

1.      **Elieser Yael Velásquez Catalán**

51.      Plaintiff Elieser Yael Velásquez Catalán was recruited by a local recruiter in Santiago, Chile, Victor Tocanini, to come work on Vermillion Ranch.

52.      On or around mid-May 2003, via telephone from Santiago, Victor Tocanini told Mr. Yael Velásquez that: (1) he would work on a ranch in the U.S.; (2) he would work with cattle; and (3) the work would be for three years.  During this discussion, Victor Tocanini omitted material facts about the true working conditions on the Vermillion ranch, including, but not limited to, the confiscation of his passport and documents, the holding of his pay, the long hours and the restriction on his freedom of movement.

53.      Furthermore, Victor Tocanini told Mr. Yael Velásquez that he would receive good pay of more than $1,000 per month and that the accommodations and treatment on the ranch were good.

54.      On or around June 2, 2003, in Santiago, Victor Tocanini repeated these earlier promises to Mr. Yael Velásquez.

55.      In reliance on these promises, Mr. Yael Velásquez accepted this work with Defendants.  He paid travel expenses to travel from his home town of Bahía Murta to Santiago, Chile.  He also paid money to Victor Tocanini, which included visa and other processing fees, in order to come to the U.S. on an H-2A visa.

56.      On information and belief, on or around February 2003, Defendant Jean Dickinson, signed, under the penalty of perjury, an application for temporary foreign labor

certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103. This application

was submitted to the U.S. DOL and received approval.

57. On information and belief, an H-2A visa was issued to Mr. Yael Velásquez

pursuant to this approval. His initial H-2A visa was valid from May 20, 2003 through November

30, 2003.

58. By nature of these promises and the job offer, Defendants entered into an

employment contract with Mr. Yael Velásquez.

59. Victor Tocanini provided the airline ticket purchased by Defendant VRLP. Mr.

Yael Velásquez flew from Santiago, Chile and arrived in Rock Springs, Wyo. on June 3, 2003.

60. That same day, Defendant Jean Dickinson picked Mr. Yael Velásquez up at the

airport and confiscated his passport and H-2A visa.

61. On or about June 13, 2003, Defendant Jean Dickinson took Mr. Yael Velásquez to

the Rock Springs National Bank in Rock Springs, and told him to sign a piece of paper that

contained writing in English, which Mr. Yael Velásquez could not read. The paper authorized

members of the Wright Dickinson Family to deposit and/or withdraw money from his account.

62. Defendant Jean Dickinson then took Mr. Yael Velásquez to the Social Security

office in Rock Springs, where he obtained a Social Security card pursuant to his H-2A visa.

63. Defendant Jean Dickinson confiscated Mr. Yael Velásquez's Social Security card

and all of his bank documents.

64. At the ranch, Defendant Marc Dickinson, who is fluent in Spanish, told Mr. Yael

Velásquez that he could never leave the ranch. Defendant Marc Dickinson also told Mr. Yael

Velásquez that he had to stay in the area of his housing and workstation, even if his job duties did not require him to be on-call on a standby basis.

65.     During Mr. Yael Velásquez's time at the ranch, he performed some work that included taking care of cattle out on the range.

66.     The majority of his time on the ranch, however, was spent performing work that did not include taking care of cattle out on the range and did not require his constant attendance out on the range on a standby basis.  Mr. Yael Velásquez, for example, performed work such as cutting poles for the construction of a corral and constructing a decorative rock and cement landscaping retaining wall at Defendants Pauline and Wright Dickinson's house.

67.     During this time, Mr. Yael Velásquez worked approximately ten to eighteen hours per day, seven days per week.

68.     The vast majority of his time on the ranch, Mr. Yael Velásquez had a fixed work schedule set by Defendants that was based on the work he was performing at the time.

69.     The only time off Mr. Yael Velásquez received was three to four free hours on Christmas day.

70.     During his time working on the ranch, Defendants did not pay Mr. Yael Velásquez with any kind of negotiable instrument or cash.  Instead, Defendants provided him with a monthly pay statement on or around the beginning of the month.

71.     Each monthly pay statement showed that Mr. Yael Velásquez's gross earnings were $800 per month, before deductions.  This pay statement misled Mr. Yael Velásquez about the proper wage for the work that he was performing.

72.     Deductions occurring every month included approximately $150 for food and $50 per month for tax withholdings.  In addition, most monthly pay statements show additional deductions for items such as clothing, tea, cigarettes and other items.

73.     Monthly pay statements from June 2003 and July 2003 showed that Mr. Yael Velásquez owed money to the ranch for these months because Defendants had deducted the cost of his airfare from Chile as well as food, work clothes and other expenses.

74.     While Defendants eventually reimbursed Mr. Yael Velásquez for his airfare approximately three months after his arrival, they never reimbursed him for other costs he had expended to come to the U.S.

75.     When there was a positive balance, Defendants deposited this money into Rock Springs National Bank; however, Mr. Yael Velásquez was unable to withdraw money from this account without having his bank documents, account number, and access to his identification.

76.     Mr. Yael Velásquez could send money home to Chile only with the permission and the assistance of the Dickinson Defendants.

77.     Mr. Yael Velásquez lived in several different locations during the two years that he worked on Vermillion Ranch.  He sometimes did not have access to a telephone for long periods of time.

78.     For example, while Mr. Yael Velásquez worked at building a corral, he did not have access to a telephone.  There was no telephone near his living area or work area, and Defendant Marc Dickinson had told Mr. Yael Velásquez that he was not allowed to leave his housing and work area unless told to do so by one of the Dickinson Defendants.

79.     Sometimes, in order to use a telephone, Mr. Yael Velásquez would ride a horse, traveling several hours to cross the mountains during the night, to access a telephone in other workers' housing.  Mr. Yael Velásquez would then travel several hours by horseback to return to his housing by sunrise so that the Dickinson Defendants would not know that he had left his housing and work area in order to use a telephone.

80.     Mr. Yael Velásquez believed that the Dickinson Defendants would be very angry if they knew he had left his housing in order to use the telephone.

81.     During the time that Mr. Yael Velásquez was on the ranch, his H-2A visa had been extended several times until November 30, 2005**.**

82.     On or around October 3, 2003, February 4, 2004, October 1, 2004 and February 7, 2005, Defendant Jean Dickinson, signed, under the penalty of perjury, applications for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103. These applications were submitted to the U.S. DOL and approved.

83.     On information and belief, the H-2A visa extensions that had been issued to Mr. Yael Velásquez were pursuant to these approvals.

84.     Due to the many injustices on the ranch, Mr. Yael Velásquez and his brother, Sergio Velásquez Catalán, who also worked on the ranch, made the decision to leave the ranch.

85.     During the week of June 6, 2005, Messrs. Yael Velásquez and Sergio Velásquez told Defendant Marc Dickinson that they wished to leave the ranch.

86.     Messrs. Yael Velásquez and Sergio Velásquez asked Defendant Marc Dickinson for their pay for the years that they had worked on the ranch, and told Defendant Marc Dickinson that they wanted to return to Chile.

87.     Messrs. Yael Velásquez and Sergio Velásquez also asked Defendant Marc Dickinson for their bank records and money, and asked to know how much money they had in their accounts.

88.     Defendant Marc Dickinson refused to provide Messrs. Yael Velásquez and Sergio Velásquez with their bank records and money, and said that they could not have plane tickets to leave the ranch until at least thirty days had passed.

89.     The Dickinson Defendants sent Messrs. Yael Velásquez and Sergio Velásquez back to their housing and work area, next to the corral that they were building.  Defendant Marc Dickinson told Messrs. Yael Velásquez and Sergio Velásquez to continue working on the corral.

90.     Defendant Marc Dickinson directed Messrs. Yael Velásquez and Sergio Velásquez to assist him in taking some horses and saddles to the garage near the house of Pauline and Wright Dickinson, thus removing Messrs. Yael Velásquez's and Sergio Velásquez's access to horses.  Without this minimal transportation, they had no means of accessing a telephone.

91.     Defendant Wright Dickinson transported Messrs. Yael Velásquez and Sergio Velásquez back to their work quarters, at the corral.  During the ride, Messrs. Yael Velásquez and Sergio Velásquez asked Defendant Wright Dickinson to send Defendant Marc Dickinson who is fluent in Spanish to talk with them, because they wanted to leave the ranch.

92.     As directed, Messrs. Yael Velásquez and Sergio Velásquez continued to work on the corral.

93.     When Defendant Marc Dickinson did not come after approximately three days, Messrs. Yael Velásquez and Sergio Velásquez decided that they needed to try again and go

15

speak directly with the Dickinson Defendants.  To do so, they needed to get to the house of Defendants Wright and Pauline Dickinson.

94.     Messrs. Yael Velásquez and Sergio Velásquez had no access to a telephone, or horses or other transportation, with the exception of a small skid steer tractor that they used for building the corral.

95.     Messrs. Yael Velásquez and Sergio Velásquez put all of their belongings in the bucket of the skid steer tractor.  Mr. Sergio Velásquez rode in the bucket of the tractor with the belongings, and Mr. Yael Velásquez drove the tractor for approximately three hours over gravel roads until they arrived at the house of Defendants Wright and Pauline Dickinson.

96.     Workers living near the house of Wright and Pauline Dickinson usually had access to the phone that was located in the garage next to the house of Defendants Wright and Pauline Dickinson.  Upon the arrival of Messrs. Yael Velásquez and Sergio Velásquez on the skid steer tractor, Defendant T. Wright Dickinson removed the telephone from the garage, making it inaccessible to Messrs. Yael Velásquez and Sergio Velásquez.

97.     Mr. Yael Velásquez told Defendant Marc Dickinson that Messrs. Yael Velásquez and Sergio Velásquez wanted their money, and that they wanted to return to Chile.

98.     Defendant Marc Dickinson told Messrs. Yael Velásquez and Sergio Velásquez that if they wanted to leave the ranch, he would call immigration and have them deported.

99.     Defendant Marc Dickinson refused to give Messrs. Yael Velásquez and Sergio Velásquez their passports, immigration documents, and money.

100.     Mr. Yael Velásquez has two friends who live in Boulder, Colorado.

101.    Defendant Marc Dickinson told Mr. Yael Velásquez if Messrs. Yael Velásquez and Sergio Velásquez left the ranch, he would also have the police and immigration place the Boulder friends under surveillance.

102.    Defendant Marc Dickinson took Messrs. Yael Velásquez and Sergio Velásquez back to their housing next to the corral, and left them there without access to a telephone or transportation.

103.    Defendant Marc Dickinson told Messrs. Yael Velásquez and Sergio Velásquez to keep building the corral.

104.    The closest town to their housing was Rock Springs, Wyo., more than sixty miles away.

105.    Messrs. Yael Velásquez and Sergio Velásquez stayed in their camp for five or six days, without other human contact.

106.    Due to the threats that had been made by Defendant Marc Dickinson, Messrs. Yael Velásquez and Sergio Velásquez feared for the safety of his Boulder friends, and for their own safety.  They continued working so as not to anger the Dickinson Defendants and so that the Dickinson Defendants would not act on the threats that Defendant Marc Dickinson had made.

107.    On or around June 14, 2005, they saw a man near their camp.  He was hunting on the ranch, much of which is located on government land managed by the federal Bureau of Land Management.  The man allowed Mr. Yael Velásquez to use his mobile telephone, and Mr. Yael Velásquez was able to call several friends and arrange a rescue in the middle of the night.

108.    Messrs. Yael Velásquez and Sergio Velásquez were rescued from the ranch in the early morning hours on June 15, 2005.

109.    Messrs. Yael Velásquez and Sergio Velásquez had to leave the ranch without their passports, pay, immigration documents, or Social Security cards.  Without their passports and money, they could not return to Chile.

110.    Via a letter dated July 20, 2005 and sent to Defendants, Messrs. Yael Velásquez and Sergio Velásquez requested that their documents and their pay be sent to them at a safe address.

111.    Messrs. Yael Velásquez and Sergio Velásquez did not let Defendants know where they were living, because they feared the threats that had been made against them and their friends.

112.    Defendants received the letter on August 1, 2005.

113.    Defendants, through their immigration attorney Anne Filbert, sent a return letter dated August 9, 2005, refusing to give Messrs. Yael Velásquez and Sergio Velásquez their money and documents.  The letter also stated that Ms. Filbert had spoken with a prosecuting attorney with the U.S. Immigration and Customs Enforcement office about their deportation.

114.    Defendants failed to return the pay belonging to Messrs. Yael Velásquez and Sergio Velásquez within ten days of their written demand.

115.    Due to the abuse he suffered on Vermillion Ranch at the hands of Defendants, Mr. Yael Velásquez suffered severe emotional distress.

**2.    Sergio Velásquez Catalán**

116.    Sergio Velásquez Catalán was recruited in Chile by Victor Tocanini to come work on Vermillion Ranch.

117.    In or around February, March and April, 2004, Victor Tocanini called Mr. Sergio

Velásquez via telephone from Santiago several times, and told Mr. Sergio Velásquez that: (1) he

would work on a ranch in the U.S.; (2) he would work with cattle; and (3) the work would be for

three years.  During this discussion, Victor Tocanini omitted material facts about the true

working conditions on the Vermillion ranch, including, but not limited to, the confiscation of his

passport and documents, the holding of his pay, the long hours, and the restriction on his

freedom of movement.

118.    Furthermore, Victor Tocanini told Mr. Sergio Velásquez that the work was good.

119.    On or around April 15, 2004, in Santiago, Victor Tocanini repeated these earlier

promises to Mr. Sergio Velásquez and also stated that he would be paid $1,100 per month.

120.    Mr. Sergio Velásquez accepted this work with Defendants.  He paid travel

expenses to travel from his home town Bahía Murta to Santiago, Chile.  He also paid for

overnight lodging and subsistence expenses to stay overnight in Santiago, Chile to wait for

arrangements to be completed.  Finally, he paid money to Victor Tocanini, which included visa

and other processing fees in order to come to the U.S. on an H-2A visa.

121.    On or around February 2, 2004, Defendant Jean Dickinson signed, under the

penalty of perjury, an application for temporary foreign labor certification agreeing to abide by

assurances outlined in 20 C.F.R. § 655.103.  This application was submitted to the U.S. DOL and

received approval.

122.    On information and belief, an H-2A visa was issued to Mr. Sergio Velásquez

pursuant to this approval.  His initial H-2A visa was valid from April 14, 2004 through

November 30, 2004.

123.    By nature of these promises and the job offer, Defendants entered into an employment contract with Mr. Sergio Velásquez.

124.    Victor Tocanini provided the airline ticket purchased by Defendant VRLP.  Mr. Sergio Velásquez flew from Santiago, Chile and arrived in Rock Springs, Wyo. on April 16, 2004.

125.    That same day, Defendants Jean Dickinson and Marc Dickinson picked Mr. Sergio Velásquez up at the airport.  Defendant Jean Dickinson confiscated his passport and H-2A visa.

126.    Mr. Sergio Velásquez arrived at the ranch with five other workers from Chile.

127.    At the ranch, Defendants Marc Dickinson and Jean Dickinson called a meeting of the new workers.  Defendant Marc Dickinson told the workers that Defendants would: (1) hold their passports, immigration documents and Social Security cards; (2) return such documents and their pay only after the end of the three year contract period; (3) require that each worker stay in his area of his housing and work area, even though his job duties did not require him to be on-call on a standby basis; (4) prohibit workers from leaving the ranch for any reason; and (5) send back any worker who left his housing and work area no matter what kind of work he was doing.

128.    Defendant Jean Dickinson took Mr. Sergio Velásquez to the Rock Springs National Bank in Rock Springs, and told him to sign a piece of paper that contained writing in English, which Mr. Sergio Velásquez could not read.  The paper authorized members of the Wright Dickinson Family to deposit and/or withdraw money from his account.

129.    Defendant Jean Dickinson also took Mr. Sergio Velásquez to the Social Security office in Rock Springs, where he obtained a Social Security card pursuant to his H-2A visa.

130.    Defendant Jean Dickinson confiscated Mr. Sergio Velásquez's Social Security card and all of his bank documents.

131.    This visit to Rock Springs was the only time that Mr. Sergio Velásquez left Vermillion Ranch during the fourteen months that he worked for VRLP.

132.    During Mr. Sergio Velásquez's time at the ranch, he performed some work that included taking care of cattle out on the range.

133.    The majority of his time on the ranch, however, was spent performing work that did not include taking care of cattle out on the range and did not require his constant attendance out on the range on a standby basis.  Mr. Sergio Velásquez, for example, performed work such as cutting poles for the construction of a corral and driving a tractor.

134.    On Vermillion Ranch, Mr. Sergio Velásquez worked approximately ten to eighteen hours per day, seven days per week.

135.    Almost the entire time that he was on the ranch, Mr. Sergio Velásquez had a fixed work schedule set by Defendants that was based on the work he was performing at the time.

136.    Mr. Sergio Velásquez received three or four hours of free time on Christmas day.

137.    During his time working on the ranch, Defendants did not pay Mr. Sergio Velásquez with any kind of negotiable instrument or cash.  Instead, Defendants provided him with a monthly pay statement on or around the beginning of each month.

138.    Each monthly pay statement showed that Mr. Sergio Velásquez's gross earnings were $800 per month, before deductions.  This pay statement misled Mr. Sergio Velásquez about the proper wage for the work that he was performing.

139.    Deductions occurring every month included approximately $150 for food and $50 per month for tax withholdings.  In addition, most monthly pay statements show additional deductions for items such as clothing, tea, cigarettes and other items.

140.    For the months of April 2004, May 2004, and June 2004, monthly pay statements show that Mr. Sergio Velásquez owed money to the ranch at the end of the pay period because they had deducted the cost of his airfare from Chile as well as food, work clothes and other expenses.

141.    While Defendants eventually reimbursed Mr. Sergio Velásquez for his airfare approximately three months after his arrival, they never reimbursed him for other costs he had expended to come to the U.S.

142.    When there was a positive balance, Defendants deposited this money into Rock Springs National Bank.  Mr. Sergio Velásquez, however, was unable to withdraw money from this account without having his bank documents, account number, and access to his identification.

143.    Mr. Sergio Velásquez could send money home only with the permission and the assistance of the Dickinson Defendants.

144.    The only way that Mr. Sergio Velásquez could receive mail was through the Dickinson Defendants.

145.    Mr. Sergio Velásquez received a package from his wife that had been opened. Upon information and belief, the package was opened and inspected by the Dickinson Defendants.

146.    Like Mr. Yael Velásquez, Mr. Sergio Velásquez lived in several different locations during the fourteen months that he worked on Vermillion Ranch.  During this time, he sometimes did not have access to a telephone.

147.    Like Mr. Yael Velásquez, Mr. Sergio Velásquez would similarly ride a horse in order to use a telephone, traveling several hours to cross the mountains during the night, to access a telephone in other workers' housing.

148.    Mr. Sergio Velásquez also believed that the Dickinson Defendants would be very angry if they knew he had left his housing at night in order to use the telephone, because Marc Dickinson had told him that he would be sent back to Chile if he left his housing and work area.

149.    During the time that Mr. Sergio Velásquez was on the ranch, his H-2A visa had been extended several times until November 30, 2005.

150.    On or around October 1, 2004 and February 7, 2005, Defendant Jean Dickinson signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.  These applications were submitted to the U.S. DOL and received approvals.

151.    On information and belief, the H-2A visa extensions that had been issued to Mr. Sergio Velásquez were pursuant to these approvals.

152.    As described in paragraph 84, Mr. Sergio Velásquez decided to leave the ranch due to the many injustices on the ranch.

153.    As described in paragraphs 85-107, Mr. Sergio Velásquez was not able to escape from the ranch and had to continue working along with his brother Mr. Yael Velásquez, until June 15, 2005.

154.     As described in paragraphs 108 through 110, Mr. Sergio Velásquez had to leave the ranch without his documents and made a request for these documents, along with his brother, Mr. Yael Velásquez.

155.     Defendants refused the demand, as described in paragraphs 111 through 114.

156.     Due to the abuse he suffered on Vermillion Ranch at the hands of Defendants, Mr. Sergio Velásquez suffered severe emotional distress.

**3.     Humberto Heraldo Berrocal Ortiz**

157.     Plaintiff Humberto Heraldo Berrocal Ortiz was recruited in Chile by Victor Tocanini to work for the Dickinson Defendants on Vermillion Ranch.

158.     On or around mid-March, 2004, Victor Tocanini told Mr. Berrocal by telephone from Santiago, Chile, that: (1) he would work on a ranch in the U.S.; (2) he would work with cattle; and (3) the work would be for three years.  During this discussion, Victor Tocanini omitted material facts about the true working conditions on the Vermillion ranch, including, but not limited to, the confiscation of his passport and documents, the holding of his pay, the long hours and the restriction on his freedom of movement.

159.     Mr. Berrocal accepted this work with VRLP.  He paid travel expenses to travel from his home town of Coyhaique to Santiago, Chile.  He also paid for overnight lodging and subsistence expenses to stay overnight in Santiago, Chile to wait for arrangements to be completed.  Finally, he paid money to Victor Tocanini, which included visa and other processing fees in order to come to the U.S. on an H-2A visa.

160.     On or around February 4, 2004, Defendant Jean Dickinson, signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by

assurances outlined in 20 C.F.R. § 655.103.  This application was submitted to the U.S. DOL and received approval.

161.    On information and belief, an H-2A visa was issued to Mr. Berrocal pursuant to this approval.  His initial H-2A visa was valid from April 14, 2004 through November 30, 2004.

162.    By nature of these promises and the job offer, Defendants entered into an employment contract with Mr. Berrocal.

163.    Victor Tocanini provided the airline ticket purchased by Defendant VRLP.  Mr. Berrocal flew from Santiago, Chile and arrived in Rock Springs, Wyo. on April 16, 2004.

164.    That same day, Defendants Jean Dickinson and Marc Dickinson picked Mr. Berrocal up at the airport.  Defendant Jean Dickinson confiscated his passport and H-2A visa.

165.    Defendant Jean Dickinson took Mr. Berrocal to the Rock Springs National Bank in Rock Springs, and told him to sign a piece of paper that contained writing in English, which Mr. Berrocal could not read.  The paper authorized members of the Wright Dickinson Family to deposit and/or withdraw money from his account.

166.    Defendant Jean Dickinson also took Mr. Berrocal to the Social Security office in Rock Springs, where he obtained a Social Security card pursuant to his H-2A visa.

167.    Defendant Jean Dickinson confiscated Mr. Berrocal's Social Security card and all of his bank documents.

168.    As described in paragraph 127, Mr. Berrocal was told about the rules on the ranch.

169.    During Mr. Berrocal's time at the ranch, he performed some work that included taking care of cattle out on the range.

170.     The majority of his time on the ranch, however, was spent performing work that did not include taking care of cattle out on the range and did not require his constant attendance out on the range on a standby basis.  Mr. Berrocal, for example, performed work such as painting gates for the construction of corrals.

171.     On Vermillion Ranch, Mr. Berrocal worked approximately twelve to eighteen hours per day, seven days per week.

172.     Almost the entire time that he was on the ranch, Mr. Berrocal had a fixed work schedule set by Defendants that was based on the work he was performing at the time.

173.     Mr. Berrocal received three or four hours of free time on Christmas day.

174.     During his time working on the ranch, Defendants did not pay Mr. Berrocal with any kind of negotiable instrument or cash.  Instead, Defendants provided him with a monthly pay statement on or around the beginning of each month.

175.     Each monthly pay statement showed that Mr. Berrocal's gross earnings were $800 per month, before deductions.  This monthly pay statement misled Mr. Berrocal about the proper wage for the work that he was performing.

176.     Deductions occurring every month included approximately $150 for food and $50 per month for tax withholdings.  In addition, most monthly pay statements show additional deductions for items such as clothing, tea, cigarettes and other items.

177.     During the months of April 2004, May 2004 and June 2004, Mr. Berrocal's monthly pay statements showed that he owed money to the ranch because they had deducted the cost of his airfare from Chile as well as food, work clothes and other expenses from his pay.

178.     While Defendants eventually reimbursed Mr. Berrocal for his airfare approximately three months after his arrival, they never reimbursed him for other costs he had expended to come to the U.S.

179.     When there was a positive balance, Defendants deposited this money into Rock Springs National Bank; however, Mr. Berrocal was unable to withdraw money from this account without having his bank documents, account number, and access to his identification.

180.     Mr. Berrocal could send money home only with the permission and the assistance of the Dickinson Defendants.

181.     On or about April 27, 2004, Mr. Berrocal was injured while working on Vermillion Ranch.  He was thrown from a horse and kicked, and he became unconscious.

182.     For several days, Mr. Berrocal experienced dizziness, headaches, abdominal pain, and chest pain.  He also had a bleeding head and a broken nose.

183.     The Dickinson Defendants did not take Mr. Berrocal to a medical facility. Instead, Defendant Marc Dickinson ordered Mr. Berrocal to continue working.

184.     Seven or eight days passed, and Mr. Berrocal resumed bleeding, this time profusely, from his nose and mouth.

185.     After a co-worker pleaded with Defendant Marc Dickinson, Defendant Marc Dickinson finally took Mr. Berrocal to the emergency room in Rock Springs, where he was treated and told to rest and return for follow up care.

186.     When they returned to the ranch, Defendant Marc Dickinson told Mr. Berrocal that he had to continue working after only one day of rest.

187.    The Dickinson Defendants did not take Mr. Berrocal back to a medical facility for follow up treatment.

188.    The Dickinson Defendants did not report the injury to their Workers' Compensation insurance carrier.

189.    After the injury, Defendant Marc Dickinson often threatened Mr. Berrocal and told him that he was not worth anything as an employee and that he should just be sent back to Chile.

190.    Mr. Berrocal feared being sent back to Chile because he reasonably believed that if he was sent back to Chile, he would not be able to obtain a future visa to work in the U.S.

191.    In June 2005, Mr. Berrocal spoke with an attorney at Colorado Legal Services, and told the attorney that he was still in poor health as a result of his injury a year earlier.

192.    At Mr. Berrocal's request, the attorney submitted notice of the workers' compensation claim to the Division of Workers' Compensation.

193.    During September 2005, when the Dickinson Defendants learned of the claim, Defendant Marc Dickinson and his wife, Diedre Dickinson, interviewed Mr. Berrocal on videotape, asking questions about the injury and his experiences on the ranch.  On information and belief, Defendant Marc Dickinson conducted this taped interview with the intent of exculpating VRLP from the workers' compensation claim, and also with the intent of intimidating Mr. Berrocal so that he would not pursue that claim or any other claim against VRLP.

194.    Defendant Marc Dickinson told Mr. Berrocal that if he spoke with the attorney, he had to tell the attorney that he did not want to continue working with her and that he otherwise should not have any more contact with the attorney.

195.    The workers' compensation insurance company set a doctor's appointment for Mr. Berrocal on September 15, 2005, in Craig, Colorado.

196.    Before the appointment, Defendant Marc Dickinson told Mr. Berrocal that he should tell the doctor that he was feeling fine and could work, and that his injuries were caused by an accident he had earlier in Chile.

197.    Defendant Pauline Dickinson drove Mr. Berrocal to the doctor's appointment, and sat in the room with him during the interview with the doctor.

198.    Mr. Berrocal feared that if he did not do as told, Defendant Marc Dickinson would deport him back to Chile, and he would not receive any compensation or treatment for his injury nor would he ever be able to obtain another H-2A job in the U.S.

199.    While the workers' compensation claim was pending, Mr. Berrocal did not receive any mail relating to the claim.  Upon information and belief, the Dickinson Defendants received the workers' compensation mailings and failed to give them to Mr. Berrocal.

200.    On October 18, 2005, Defendant Marc Dickinson told Mr. Berrocal that he had to sign a letter.  The letter said that Mr. Berrocal did not want his attorney to represent him anymore.  Because he was fearful of being sent back to Chile, Mr. Berrocal signed the letter.

201.    Due to control and threats from the Dickinson Defendants, Mr. Berrocal was not able to use the mail or telephone to communicate with his attorney.  Mr. Berrocal feared that the Dickinson Defendants would send him to Chile if he contacted the attorney.

202.    These events made it impossible for Mr. Berrocal to pursue his worker's compensation claim while remaining on the ranch.

203.    During the time that Mr. Berrocal was on the ranch, his H-2A visa had been extended several times until November 30, 2005.

204.    On or around October 1, 2004 and February 7, 2005, Defendant Jean Dickinson, signed, under the penalty of perjury, applications for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.  These applications were submitted to the U.S. DOL and received approvals.

205.    On information and belief, the H-2A visa extensions that had been issued to Mr. Berrocal were pursuant to these approvals.

206.    In October 2005, Mr. Berrocal encountered a man who was hunting on the ranch. The man assisted Mr. Berrocal in accessing communication and Mr. Berrocal was able to get help in escaping from the ranch.

207.    Mr. Berrocal escaped from the ranch in the middle of the night on October 28, 2005.

208.    Mr. Berrocal had to leave the ranch without the pay for the one and a half years that he worked on the ranch, and without his passport, immigration documents, and Social Security card.

209.    During the eighteen months that he was on Vermillion Ranch, Mr. Berrocal left the ranch a total of three times.  The first time was a trip to the bank and Social Security office in Rock Springs.  The second time was for medical attention in Rock Springs, and the third time was for a doctor's appointment scheduled by the workers compensation insurance company.

210.    Due to the abuse he suffered on Vermillion Ranch at the hands of Defendants, Mr. Berrocal suffered severe emotional distress.

**4.     Luis Alejandro Fuentes Sandoval**

211.    Plaintiff Luis Alejandro Fuentes Sandoval was recruited by a local recruiter in Santiago, Chile, Victor Tocanini, to come work on Vermillion Ranch.

212.    In or around February, March and April 2004, via telephone from Santiago, Chile, and in person in Santiago, Victor Tocanini told Mr. Fuentes that: (1) he would work on a ranch in the U.S.; (2) he would work with cattle; and (3) the work would be for three years.  During this discussion, Victor Tocanini omitted material facts about the true working conditions on Vermillion ranch, including, but not limited to, the confiscation of his passport and documents, the holding of his pay, the long hours and the restriction on his freedom of movement.

213.    Furthermore, Victor Tocanini told Mr. Fuentes that he would work about eight hours per day.

214.    In reliance on these promises, Mr. Fuentes accepted this work with Defendants. He paid travel expenses to travel from his home town of Coyhaique to Santiago, Chile.  He also paid for overnight lodging and subsistence expenses to stay overnight in Santiago, Chile to wait for arrangements to be completed.  Finally, he paid money to Victor Tocanini, which included visa and other processing fees in order to come to the U.S. on an H-2A visa.

215.    On or around February 4, 2004, Defendant Jean Dickinson, signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.  This application was submitted to the U.S. DOL and received approval.

216.    On information and belief, an H-2A visa was issued to Mr. Fuentes pursuant to this approval.  On information and belief, his initial H-2A visa was valid from April 14, 2004 through November 30, 2004.

217.    By nature of these promises and the job offer, Defendants entered into an employment contract with Mr. Fuentes.

218.    Victor Tocanini provided the airline ticket purchased by Defendant VRLP.  Mr. Fuentes flew from Santiago, Chile and arrived in Rock Springs, Wyo. on April 16, 2004.

219.    Defendants Marc Dickinson and Jean Dickinson picked Mr. Fuentes up at the airport and confiscated his passport and H-2A visa on that same day.  Mr. Fuentes was told that his documents would be returned to him after one day, though they were never returned to him while he worked on the ranch.

220.    Mr. Fuentes was scared not to have his documents, as he believed that without them, he was illegally here in the U.S.

221.    Defendant Jean Dickinson took Mr. Fuentes to the Rock Springs National Bank in Rock Springs, and told him to sign a piece of paper that contained writing in English, which Mr. Fuentes could not read.  The paper authorized members of the Wright Dickinson Family to deposit and/or withdraw money from his account.

222.    Defendant Jean Dickinson also took Mr. Fuentes to the Social Security office in Rock Springs, where he obtained a Social Security card pursuant to his H-2A visa.

223.    Defendant Jean Dickinson confiscated Mr. Fuentes's Social Security card and all of his bank documents.

224.    As described in paragraph 127, Mr. Fuentes was told about the rules on the ranch.

32

225.    During Mr. Fuentes's time at the ranch, he never performed work that involved taking care of cattle out on the range that required his constant attendance out on the range on a standby basis.

226.    Mr. Fuentes, for example, performed work in the mechanic shop that is located next to the main ranch house, the home of Defendants Pauline and Wright Dickinson, repairing tractors.

227.    During his time on the ranch, Mr. Fuentes generally worked approximately eleven to thirteen hours per day, seven days per week with a set work schedule.

228.    Mr. Fuentes was told by the Dickinson Defendants that he would have Christmas day off, but even on that day he had to work for several hours since the Dickinson Defendants made him clean his house.  He ended up working an eight-hour day on Christmas day.

229.    While working with horses, he broke his foot.  Mr. Fuentes had to ask for medical care several times before Defendant Wright Dickinson took Mr. Fuentes to the hospital the next day.  At the hospital, Mr. Fuentes received x-rays and a cast for his foot.

230.    Mr. Fuentes returned to the ranch the next day.  Although the doctor had ordered approximately fifteen days of rest, Wright Dickinson ordered Mr. Fuentes to continue to work every day, using only one foot, without any day of rest to recover from his injury.  Mr. Fuentes experienced considerable pain during this time.

231.    Defendants did not take Mr. Fuentes back to a medical facility for follow up treatment, and Mr. Fuentes had to remove his own cast.

232.    On information and belief, Defendants did not report this injury to their workers' compensation insurance carrier.

233.    Mr. Fuentes did not know that he was entitled to workers' compensation, and he continues to experience pain in his foot.

234.    In or around December 2004, Mr. Fuentes injured his eye while welding in the mechanic shop.  Mr. Fuentes requested medical attention several times before Defendant Pauline Dickinson took him to the doctor three days after the injury.  The doctor removed four pieces of metal from Mr. Fuentes' eye.

235.    Again, Mr. Fuentes received no days of rest to recover from his injury and the Dickinson Defendants required him to resume welding.

236.    On information and belief, Defendants also did not report the injury to their workers' compensation insurance carrier.

237.    During his time working on the ranch, Defendants did not pay Mr. Fuentes with any kind of negotiable instrument or cash.  Instead, Defendants provided him with a monthly pay statement on or around the beginning of each month.

238.    Each monthly pay statement showed that Mr. Fuentes' gross earnings were $800 per month, before deductions.  This pay statement misled Mr. Fuentes about the proper wage for the work he was performing.

239.    Deductions occurring every month included approximately $150 for food and $50 per month for tax withholdings.  In addition, most monthly pay statements show additional deductions for items such as clothing, tea, cigarettes and other items.

240.    Monthly pay statements from April 2004, May 2004 and June 2004 showed that Mr. Fuentes owed money to Defendants for these months because Defendants had deducted the cost of his airfare from Chile as well as food, work clothes and other expenses.

241.    While Defendants eventually reimbursed Mr. Fuentes for his airfare approximately three months after his arrival, they never reimbursed him for other costs he had expended to come to the U.S.

242.    When there was a positive balance, Defendants deposited this money into Rock Springs National Bank; however, Mr. Fuentes was unable to withdraw money from this account without having his bank documents, account number, and access to his identification.

243.    Mr. Fuentes could send money home only with the permission and the assistance of the Dickinson Defendants.

244.    The entire time that Mr. Fuentes was on the ranch, he lived in a little house by the mechanic shop adjacent to the home of Defendants Pauline and Wright Dickinson.

245.    This housing had no toilet or shower and Mr. Fuentes slept in a tiny room with two other workers.

246.    During the time Mr. Fuentes was on the ranch, his H-2A visa had been extended several times until November 30, 2005.

247.    On or around October 1, 2004 and February 7, 2005, Defendant Jean Dickinson signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.  These applications were submitted to the U.S. DOL and received approvals.

248.    On information and belief, the H-2A visa extensions that had been issued to Mr. Fuentes were pursuant to these approvals.

249.     Mr. Fuentes sometimes had access to a telephone in the mechanic shop.  Many times, he had to ask the Defendants for permission to use the telephone.  Defendants also sometimes physically removed workers' access to the telephone.

250.     This telephone line was the same as that inside the house of Defendants Pauline and Wright Dickinson and Mr. Fuentes believed that the Dickinson Defendants monitored his and other workers' telephone conversations.

251.     On or around October 25, 2005, Defendant T. Wright Dickinson came to Mr. Fuentes's housing at or around 6:30 a.m.  He insisted that Mr. Fuentes and the other workers go to work before their normal starting time of 7:00 a.m.  Mr. Fuentes asserted his rights by arguing to Defendant T. Wright Dickinson that they worked sufficient hours in the mechanic shop by beginning at 7:00 a.m.  No further discussion about working hours occurred after that day.

252.     After the argument, Defendant T. Wright Dickinson removed the telephone from the mechanic shop and the telephone was inaccessible for the remainder of Mr. Fuentes's time on the ranch so he could not contact anyone outside of the ranch.

253.     Suddenly on or around November 30, 2005, Defendant T. Wright Dickinson told Mr. Fuentes and his uncle, Plaintiff Oscar Sandoval Poblete, that they were being sent back to Chile.  Defendant T. Wright Dickinson claimed that their work period at Vermillion Ranch had ended.

254.     Both Messrs. Fuentes and Sandoval had been told that their work at the ranch would last for three years.  Instead, Mr. Fuentes had worked at the ranch for 18 months and Mr. Sandoval had worked on the ranch for only 4 months.

255.    On November 30, 2005, the Dickinson Defendants placed Messrs. Fuentes and Sandoval on a plane back to Chile.  Due to being sent back to Chile, Mr. Fuentes suffered economic injuries, including transportation, food and lodging expenses and difficulty in finding new employment upon his return.

5.    **Oscar Sandoval Poblete**

256.    Plaintiff Oscar Sandoval Poblete was recruited by a local recruiter in Santiago, Chile, Victor Tocanini, to come work on Vermillion Ranch.

257.    In or around July 2005, Victor Tocanini made promises to Mr. Sandoval, during which, Victor Tocanini omitted material facts about the true working conditions on the Vermillion ranch, including, but not limited to, the confiscation of his passport and documents, the holding of his pay, the long hours and the restriction on his freedom of movement.

258.    Mr. Sandoval accepted this work with Defendants.  He paid travel expenses to travel from his home town of Coyhaique to Santiago, Chile.  He also paid money to Victor Tocanini, which included visa and other processing fees in order to come to the U.S. on an H-2A visa.

259.    On or around February 7, 2005, Defendant Jean Dickinson, signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.  This application was submitted to the U.S. DOL and received approval.

260.    On information and belief, an H-2A visa was issued to Mr. Sandoval pursuant to this approval and his initial H-2A visa was issued through November 30, 2005.

261.    By nature of these promises and the job offer, Defendants entered into an employment contract with Mr. Sandoval.

262.    Victor Tocanini provided the airline ticket purchased by Defendant VRLP.  Mr. Sandoval flew from Santiago, Chile and arrived in Rock Springs, Wyo. on July 21, 2005.

263.    Defendant Pauline Dickinson picked Mr. Sandoval up at the airport and confiscated his passport and H-2A visa on that same day.

264.    Defendant Jean Dickinson took Mr. Sandoval to the Rock Springs National Bank in Rock Springs, and told him to sign a piece of paper that contained writing in English, which Mr. Sandoval could not read.  The paper authorized members of the Wright Dickinson Family to deposit and/or withdraw money from his account.

265.    Defendant Jean Dickinson also took Mr. Sandoval to the Social Security office in Rock Springs, where he obtained a Social Security card pursuant to his H-2A visa.

266.    Defendant Jean Dickinson confiscated Mr. Sandoval's Social Security card and all of his bank documents.

267.    During Mr. Sandoval's time at the ranch, he never performed work that involved taking care of cattle out on the range and his work did not require his constant attendance out on the range on a standby basis.

268.    Mr. Fuentes, for example, performed work in the mechanic shop that is located next to the main ranch house, the home of Defendants Pauline and Wright Dickinson, repairing tractors.

269.    During his time on the ranch, Mr. Sandoval worked seven days per week, approximately eleven to thirteen hours per day, with a set work schedule.

270.     During his time working on the ranch, Defendants did not pay Mr. Sandoval with any kind of negotiable instrument or cash.  Instead, Defendants provided him with a monthly pay statement on or around the beginning of the month.

271.     Each monthly pay statement showed that Mr. Sandoval's gross earnings were $800 per month, before deductions.  This pay statement misled Mr. Sandoval about the proper wage for the work he was performing.

272.     Deductions occurring every month included approximately $150 for food and $50 per month for tax withholdings.  In addition, most monthly pay statements show additional deductions for items such as clothing, tea, cigarettes and other items.

273.     Monthly pay statements from July 2005, August 2005 and September 2005 showed that Mr. Sandoval owed money to Defendants for these months because Defendants had deducted the cost of his airfare from Chile as well as food, work clothes and other expenses.

274.     While Defendants eventually reimbursed Mr. Sandoval for his airfare approximately three months after his arrival, they never reimbursed him for other costs he had expended to come to the U.S.

275.     When there was a positive balance, Defendants deposited this money into Rock Springs National Bank; however, Mr. Sandoval was unable to withdraw money from this account without having his bank documents, account number, and access to his identification.

276.     Mr. Sandoval could send money home only with the permission and the assistance of the Dickinson Defendants.

277.     The entire time that Mr. Sandoval was on the ranch, he lived in a little house by the mechanic shop adjacent to the home of Defendants Pauline and Wright Dickinson.

278.     This housing had no toilet or shower and Mr. Sandoval slept in a tiny room with two other workers.

279.     As stated in paragraph 252, the Dickinson Defendants removed the telephone in the mechanic shop making it inaccessible for the remainder of Mr. Sandoval's time on the ranch so he could not contact anyone outside of the ranch.

280.     As stated in paragraphs 253-255, Mr. Sandoval was suddenly sent back to Chile on or around November 30, 2005, after four months of working on the ranch.

281.     Due to being sent back to Chile, Mr. Sandoval suffered economic injuries, including transportation, food and lodging expenses and difficulty in finding new employment upon his return.

## D.     FAIR LABOR STANDARDS ACT

282.     Workers principally engaged in the range production of livestock are exempted from the minimum wage and overtime requirements of FLSA.  29 U.S.C. § 213(a)(6)(E).

283.     During their employment, however, Plaintiffs were principally engaged in work that was other than the range production of livestock as defined by FLSA.

284.     Plaintiffs primarily performed work that was close to headquarters and/or did not require constant attendance out on the range on a standby basis.

285.     Plaintiffs were not principally engaged in activities that would make the computation of hours difficult.

286.     During certain workweeks, Plaintiffs Humberto Berrocal, Mr. Sergio Velásquez Velásquez Catalán, Elieser Yael Velásquez Catalán, Luis Alejandro Fuentes Sandoval and Oscar Sandoval Poblete performed some work that was not agricultural work as defined by FLSA.

287.     On information and belief, Defendants did not keep track of Plaintiffs' hours worked.

288.     Plaintiffs worked, on average, ten to eighteen hours per day, seven days per week.

289.     Defendants provided Plaintiffs with pay statements indicating that they were earning a set monthly salary of $800 per month.  Based on the hours worked by Plaintiffs, Defendant VRLP used a pay rate of between $2 to $3 per hour, before deductions.

290.     Defendants did not pay the Plaintiffs in any kind of negotiable instrument or cash that the workers could access.  Instead, Defendants provided each Plaintiff with a monthly pay statement, showing the monthly earnings and deductions.  Plaintiffs did not actually receive all of these wages until after they left the ranch.

291.     All Plaintiffs paid to arrange for travel to Santiago, Chile where they took an airline flight to Rock Springs, Wyo. and for various costs related to the arrangement of their visas.  All of these out-of-pocket expenses were for the benefit of the employer.

292.     Furthermore, Defendants took deductions, as shown on Plaintiffs' pay statements, for other expenses, such as the airline flight, work clothes, work boots and work gloves, all of which were items for the benefit of the employer.  Other deductions that were taken were for the benefit of the employee, but on information and belief, were not at actual cost.

293.    During some months, their pay statements indicated that Plaintiffs had a negative balance due to deductions, making Plaintiffs indebted to Defendants.

**E.    RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)**

294.    As stated above, the Dickinson Defendants conducted an organized and unlawful worker exploitation scheme for the purpose of obtaining pecuniary gain which resulted in injury to the Plaintiffs.  They fraudulently obtained H-2A workers, making it possible for them to tightly control these workers through a series of intimidating acts, threats and retaliatory conduct, all for personal profit.

295.    In order to perpetrate this unlawful worker exploitation scheme, the Dickinson Defendants willfully and knowingly committed multiple acts of racketeering activity under 18 U.S.C. § 1961, including: 18 U.S.C. § 1546 (visa fraud), 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1592 (unlawful conduct with documents), 18 U.S.C. § 1951 (extortion) and/or Colo. Rev. Stat. § 18-3-207 (criminal extortion), and 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud).

**1.    Fraudulent Visa Applications in Violation of 18 U.S.C. § 1546**

296.    In order to continually obtain a supply of foreign H-2A workers, the Dickinson Defendants knowingly and willfully devised a scheme to defraud federal agencies by making materially false statements about their job offer and their intent to comply with all federal, state and local employment-related laws and regulations.

297.    The Dickinson Defendants collectively decided to apply for H-2A visas for their workers.  They applied for H-2A visas through their immigration attorney, Anne Filbert.

298.    Federal immigration law authorizes agricultural employers to obtain H-2A visas through an application process.  8 U.S.C. § 1188.  The H-2A application consists of several parts.

299.    First, an application for temporary foreign labor certification must be submitted to the U.S. DOL and the appropriate state agency, consisting of: (1) Application for Alien Employment Certification, Form ETA 750; and (2) Agricultural and Food Process Clearance Order, Form ETA 790.  U.S. DOL's approval of this application for temporary foreign labor certification verifies the need for foreign labor and the appropriateness of the wages and working conditions offered.

300.    Second, the approved labor certification, along with the Petition for a Nonimmigrant Worker, Petition I-129, is submitted to U.S. Citizenship and Immigration Services (U.S. CIS).  The approved labor certification determines the number of positions and period of employment for issuance of the H-2A visas.

301.    Third, upon approval of the Petition, the employer sends the notice of approval to the U.S. DOS and one of its consulate offices issues the visas in the home country of the H-2A worker.

302.    Each H-2A application must include a copy of the job offer and an agreement to abide by assurances outlined in 20 C.F.R. § 655.103.  The application for temporary foreign labor certification would not be approved without the inclusion of the job offer and assurances as required by 20 C.F.R. § 655.101(b).

303.    With all the H-2A applications submitted during the years pertinent to this complaint, Defendant Jean Dickinson signed and submitted, under the penalty of perjury, 28

U.S.C. § 1746, Defendants' job offer and a promise that they would abide by assurances outlined in 20 C.F.R. § 655.103.

304.    As part of these assurances, the applicant must certify to abide by the prohibition on retaliation against H-2A workers who have exercised or asserted their rights provided by the H-2A program as outlined in 20 C.F.R. § 655.103(g).  This provision states: "[t]he employer shall not intimidate, threaten, restrain, coerce, blacklist, discharge, or in any manner discriminate against . . . any person who has with just cause" exercised their rights under the employment contract.

305.    In particular, Defendant Jean Dickinson made false promises about retaliatory conduct against workers and the nature of the working conditions at the ranch.

306.    These false statements were made despite the fact that Defendant Jean Dickinson knew that the Dickinson Defendants' practice is to discriminate against and intimidate H-2A workers who had, with just cause, raised their rights under their employment contract.  Without these false statements, however, the Dickinson Defendants would not be able to obtain H-2A workers nor would they be able to profit from the control of these workers.

307.    During these years, the Dickinson Defendants intimidated, harassed and/or discriminated against workers who, with just cause, had raised various rights, such as workers compensation, wages and working conditions and who, with just cause, had consulted a legal assistance program about their contract rights.

308.    Another part of these assurances requires that the applicant certify that they will comply with all federal, state and local employment-related laws and regulations, 20 C.F.R. § 655.103(b), including the regular payment of wages for the kind of work performed.  Moreover,

Defendants must provide an accurate copy of the job offer to be used for the recruitment of U.S. and H-2A workers.  20 C.F.R. § 655.101(b)(1).

309.    For all years pertinent to this Complaint, Defendant Jean Dickinson filed job descriptions for work on the ranch in the H-2A applications for December through March for an "open range winter cattleherder," describing work to be performed "exclusively out on open desert range to protect pregnant commercial cows from harsh winter conditions."  The job description for April through November is for a "range calver" and involves the performance of duties "principally out on open range lands to attend to cows during calving and to care for their calves."

310.    By describing the work to be performed as being principally the range production of livestock, the Dickinson Defendants knew that they would be able to pay drastically less than the minimum wage, *see, e.g.*, 29 U.S.C. § 213(a)(6)(E), and benefit from some of the specialized exceptions from the H-2A regulations applied to employers who are seeking workers for the range production of livestock.  20 C.F.R. § 655.93; *see e.g.,* U.S. DOL Field Memo 24-01 (Aug. 1, 2001).

311.    During these years, the Dickinson Defendants failed to pay some workers the proper wage for their work, in violation of the employment-related laws and regulations, because some workers were not primarily engaged in the range production of livestock.  20 C.F.R. § 655.102(b)(9).  H-2A workers performing agricultural work in Colorado, for example, were required to receive $8.07 per hour (2003), $8.36 per hour (2004) and $8.37 per hour (2005).

312.    During these years, the Dickinson Defendants also failed, in actuality, to pay workers with a negotiable instrument or cash, on a regular basis, as required by the applicable

employment-related laws and regulations.  U.S. DOL Field Memo 24-01 (Aug. 1, 2001); 20 C.F.R. § 655.102(b)(10).

313.    Furthermore, Defendant Jean Dickinson made these statements about the kind of work performed and the promise to pay wages monthly in the job offer despite the fact that the Dickinson Defendants knew that some workers would not be principally engaged in the range production of livestock, and that all workers would not, in actuality, receive their wages monthly.

314.    During the years pertinent to this Complaint, Defendant Jean Dickinson's job offer and agreement to abide by assurances were false because she knew from the Dickinson Defendants' past practices that they would not provide work in accordance with the job offer and would not abide by assurances with all H-2A workers.

315.    As described above and in ¶¶ 56-113 (Yael Velásquez), ¶¶ 121-155 (Sergio Velásquez), ¶¶ 160-209 (Berrocal), ¶¶ 215-255 (Fuentes) and ¶¶ 259-281 (Sandoval), the Dickinson Defendants knowingly and willfully made, under the penalty of perjury, material false statements to abide by assurances in 20 C.F.R. § 655.103, in multiple H-2A applications filed pursuant to the immigration laws, in order to obtain foreign labor through the H-2A program in violation of 18 U.S.C. § 1546.

316.    As described above and in ¶¶ 56-113 (Yael Velásquez), ¶¶ 121-155 (Sergio Velásquez), ¶¶ 160-209 (Berrocal), ¶¶ 215-255 (Fuentes) and ¶¶ 259-281 (Sandoval), the Dickinson Defendants knowingly presented these H-2A applications filed pursuant to the immigration laws, containing material false statements, under the penalty of perjury, about the job offer and to abide by assurances in 20 C.F.R. § 655.103, in order to obtain foreign labor through the H-2A program in violation of 18 U.S.C. § 1546.

317.    As described above and in ¶¶ 56-113 (Yael Velásquez), ¶¶ 121-155 (Sergio Velásquez), ¶¶ 160-209 (Berrocal), ¶¶ 215-255 (Fuentes) and ¶¶ 259-281 (Sandoval), the Dickinson Defendants' wrongful actions of visa fraud proximately caused these Plaintiffs' economic injuries.

**2.    Forced Labor & Conduct With Documents Violating 18 U.S.C. §§ 1589 & 1592**

318.    The Dickinson Defendants knowingly and willfully held workers in situations of forced labor by their scheme of having Defendant Marc Dickinson threaten workers with legal coercion to cause workers to believe that they had no choice but to continue to work for the Defendants or risk serious legal harm, including arrest and deportation.

319.    During the course of such conduct described above, the Dickinson Defendants also knowingly and willfully held workers' passports and visas as part of their scheme in an attempt to prevent or restrict the workers' liberty to travel in order to maintain their labor and services.

320.    As described above and in ¶¶ 60-113 (Yael Velásquez), ¶¶ 125-155 (Sergio Velásquez) and ¶¶ 164-209 (Berrocal), the Dickinson Defendants knowingly and willfully committed acts of forced labor in violation of 18 U.S.C. §§ 1589-1590, constituting "racketeering activity" as defined by RICO, 18 U.S.C. § 1961(1).

321.    As described above and in ¶¶ 60-113 (Yael Velásquez), ¶¶ 125-155 (Sergio Velásquez) and ¶¶ 164-209 (Berrocal), the Dickinson Defendants knowingly and willfully committed unlawful conduct with respect to these Plaintiffs' passports and visas in furtherance of forced labor in violation of 18 U.S.C. § 1592, constituting "racketeering activity" as defined by RICO, 18 U.S.C. § 1961(1).

322.    As described above and in ¶¶ 60-113 (Yael Velásquez), ¶¶ 125-155 (Sergio

Velásquez) and ¶¶ 164-209 (Berrocal), the Dickinson Defendants' wrongful actions of forced

labor and unlawful conduct with respect to documents proximately caused these Plaintiffs

economic injuries.

**3.    Extortion in Violation of 18 U.S.C. § 1951 & Colo. Rev. Stat. § 18-3-207**

323.    The Dickinson Defendants knowingly and willfully participated in multiple

predicate acts of extortion by authorizing the wrongful use of threatened force and fear to induce

workers to abandon their property rights as H-2A workers.

324.    Defendant Marc Dickinson wrongfully threatened workers with arrest and

deportation for the pecuniary purpose of inducing workers to continue working and depriving

workers of legal claims they have as H-2A workers.

325.    As described above and in ¶¶ 86-113 (Yael Velásquez), ¶¶ 153-155 (Sergio

Velásquez) and ¶¶ 189-202 (Berrocal), the Dickinson Defendants knowingly and willfully used

wrongful fear with the intent to induce these Plaintiffs to abandon their property rights, in

violation of 18 U.S.C. § 1951 and/or Colo. Rev. Stat. § 18-3-207.

326.    As described above and in ¶¶ ¶¶ 86-113 (Yael Velásquez), ¶¶ 153-155 (Sergio

Velásquez) and ¶¶ 189-202 (Berrocal), the Dickinson Defendants' wrongful actions of extortion

proximately caused these Plaintiffs economic injuries.

**4.    Mispayment of Wages & Recruitment in Violation of Mail and/or Wire Fraud, 18
        U.S.C. §§ 1341 & 1343**

327.    The Dickinson Defendants knowingly, willfully and recklessly devised a scheme

to defraud workers in order to obtain their money, property, labor and/or services by deceiving

them about the pay they should receive for the kind of work that they performed as well as about the terms and conditions of the job.

328.    On information and belief, the Dickinson Defendants knew that all workers would not be principally engaged in the production of livestock out on the range and knowingly, willfully and recklessly failed to systematically pay certain workers the lawful wages for their work performed.

329.    The Dickinson Defendants misled certain workers about their status and rights under FLSA by issuing pay statements indicating that the proper pay for their work performed was $800 per month prior to deductions.

330.    On information and belief, the Dickinson Defendants used the mail, telephone and/or fax to generate and/or send pay statements, issue checks and/or deposit and/or transfer money in the bank as reflected on the workers' pay statements.  All of these communications were made with the purpose of executing and furthering their fraudulent scheme.

331.    Furthermore, on information and belief, the Dickinson Defendants authorized Victor Tocanini to recruit potential H-2A workers on their behalf in Chile, South America.

332.    On information and belief, the Dickinson Defendants authorized Victor Tocanini to promise certain workers that they will work for a three-year period on the ranch working as range herders of cattle on a temporary visa.

333.    On information and belief, the Dickinson Defendants, through Victor Tocanini, recruited workers with false representations and/or omissions about the work with the specific intent and/or reckless disregard of the truth to deceive workers about the actual pay, working

conditions and nature of the work, because such deception was often necessary to recruit workers for their ranch.

334.    In reliance on these promises, certain workers accepted this employment as H-2A workers and were induced to travel to the U.S.

335.    The Dickinson Defendants, through their immigration attorney Anne Filbert, arranged to have H-2A visas issued for the prospective workers at the U.S. Consulate in Santiago, Chile.  The Dickinson Defendants also arranged for those H-2A workers' transportation from Santiago, Chile to Rock Springs, Wyo.

336.    On information and belief, the Dickinson Defendants used the mail, telephone and/or fax to communicate indirectly and/or directly with their recruiting agent in Chile, Victor Tocanini and make travel arrangements.  In addition, as described above, they used the mail, telephone and/or fax to secure the U.S. DOL and U.S. CIS approval of their H-2A applications. All of these communications were made with the purpose of executing and furthering their fraudulent scheme.

337.    As described above and in ¶¶ 51-113 (Yael Velásquez), ¶¶ 132-142 (Sergio Velásquez), ¶¶ 169-179 (Berrocal), ¶¶ 211-255 (Fuentes) and ¶¶ 267-275 (Sandoval), the Dickinson Defendants, through their fraudulent payment and recruitment schemes, knowingly and willfully committed acts of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 & 1343, constituting "racketeering activity" as defined by RICO, 18 U.S.C. § 1961(1).

338.    As described above and in ¶¶ 51-113 (Yael Velásquez), ¶¶ 132-142 (Sergio Velásquez), ¶¶ 169-179 (Berrocal), ¶¶ 211-255 (Fuentes) and ¶¶ 267-275 (Sandoval), the

Dickinson Defendants' wrongful actions of mail and/or wire fraud proximately caused these Plaintiffs economic injuries.

**5.     RICO Enterprises**

339.    Vermillion Ranch Limited Partnership (VRLP) is a partnership and therefore an enterprise as defined by RICO, 18 U.S.C. § 1961(4).  Its ranching activities require the movement of goods across state lines and therefore affect interstate commerce.

340.    As described in paragraphs 12-20, Defendants Wright, Pauline, Marc, DeAnn, T. Wright and Jean Dickinson operated or managed VRLP throughout the relevant period described herein.

341.    The Dickinson Defendants knowingly participated in the operation or management of VRLP in order to perpetrate the unlawful worker exploitation scheme as detailed above.

342.    In the alternative, VRLP, Victor Tocanini and Anne Filbert, though not a legal entity, are a group of individuals who are associated in fact and therefore an enterprise as defined by RICO, § 1961(4).  This enterprise requires the movement of goods and people across state lines and therefore affects interstate commerce.

343.    The Dickinson Defendants, using their positions as partners and operators of VRLP, have formed ongoing associations with Anne Filbert and Victor Tocanini in order to execute essential aspects of the unlawful worker exploitation scheme.

344.    The Dickinson Defendants have a continuing association with Anne Filbert to ensure U.S. DOL and U.S. CIS approval of the H-2A applications and U.S. DOS issuance of the H-2A visas.  Furthermore, the Dickinson Defendants have a continuing association with Victor

Tocanini to identify workers in Chile for recruitment and to arrange for their paperwork to come to the U.S.  Through these continuing associations, the Dickinson Defendants are able to bring foreign workers to the U.S.

345.   The Dickinson Defendants, using their positions as partners and operators of VRLP, operated or managed the enterprise comprised of VRLP, Anne Filbert and Victor Tocanini.  They initiated the unlawful worker exploitation scheme.  They also controlled the flow of information with respect to the H-2A application process for the purposes of acquiring foreign labor for VRLP.  On information and belief, they indirectly and/or directly managed the flow of information to Victor Tocanini with respect to the terms of employment and the kinds of workers sought to work on VRLP.

346.   As detailed above, the Dickinson Defendants knowingly participated in the operation or management of the enterprise comprised of VRLP, Anne Filbert and Victor Tocanini by directing the activities and managing the flow of information within the enterprise in order to perpetrate and advance the unlawful worker exploitation scheme.

**6.   Pattern of Racketeering Activity**

347.   The predicate acts of racketeering activity described above constitute a pattern of racketeering activity as defined in RICO, U.S.C. § 1961(5).  From 2003 to the present, the Dickinson Defendants committed multiple incidents of racketeering activity comprising of forced labor, unlawful conduct with documents, mail and/or wire fraud, visa fraud and extortion against these Plaintiffs and, on information and belief, against other workers as well.

348.   The incidents of racketeering activity described above are interrelated in the following ways.  They had common participants, the Dickinson Defendants, and common

victims, the Plaintiffs.  While the incidents of racketeering activity caused distinct injuries to each of the Plaintiffs, these incidents also had the common purpose and result of economically benefiting the Dickinson Defendants at the expense of Plaintiffs.  Finally, they were interrelated incidents in that, without the mail and/or wire fraud and visa fraud, the Dickinson Defendants could not have successfully exploited Plaintiffs through forced labor, unlawful conduct with documents and extortion.

349.    Since at least 2003, these acts of racketeering activity described above have been a part of the Dickinson Defendants' regular conduct of business, and therefore, imply a threat of continued racketeering activity.

350.    Plaintiffs fear that the Dickinson Defendants may attempt to retaliate against them for the prosecution of this lawsuit.

## FIRST CLAIM FOR RELIEF

### (Fair Labor Standards Act)

351.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 to 350 as set forth above.

352.    This claim arises under FLSA, 29 U.S.C. § 201 *et seq.*, against Defendants.

353.    Defendants failed to pay Plaintiffs the required minimum and overtime wages for their work.

354.    Defendants' violations of FLSA were willful, in that the Defendants knew or showed reckless disregard for the issue of whether Defendants' conduct was prohibited by FLSA.

355.    As a result, Plaintiffs suffered damages.

## SECOND CLAIM FOR RELIEF

### (Trafficking Victims Protection Reauthorization Act)

356.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 to 355 as set forth above.

357.    This claim arises under the TVPRA against all Defendants.

358.    Pursuant to 18 U.S.C. §§ 1589-1590, Defendants knowingly recruited, harbored, provided, or obtained by any means, Plaintiffs Elieser Yael Velásquez Catalán, Sergio Velásquez Catalán and Humberto Heraldo Berrocal Ortiz for labor or services by means of:

    (a) a scheme, plan, or pattern intended to cause these Plaintiffs to believe that, if they did not perform such labor or services, that they or another person would suffer serious harm; or

    (b) the abuse or threatened abuse of law or the legal process.

359.    As a result, these Plaintiffs suffered injuries and are entitled to recover damages pursuant to 18 U.S.C. § 1595.

## THIRD CLAIM FOR RELIEF

### (RICO § 1962(c) with Vermillion Ranch Limited Partnership as the Enterprise)

360.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 to 359 as set forth above.

361.    This claim arises under RICO, 18 U.S.C. § 1962(c), against the Dickinson Defendants.

362.    The Dickinson Defendants were employed by or associated with Vermillion Ranch Limited Partnership.

363.    At all times relevant to this complaint, the Dickinson Defendants were persons as defined in RICO by 18 U.S.C. § 1961(3).

364.    At all times relevant to this complaint, the Dickinson Defendants knowingly and willfully participated in the conduct of Vermillion Ranch Limited Partnership's affairs by engaging in a pattern of racketeering activity.

365.    The Dickinson Defendants willfully and knowingly committed the following predicate acts: 18 U.S.C. § 1546 (visa fraud), 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1592 (unlawful conduct with documents), 18 U.S.C. § 1951 (extortion) and/or Colo. Rev. Stat. § 18-3-207 (criminal extortion), and 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud).

366.    As a direct, intended and foreseeable result of the Dickinson Defendants' violations of RICO, Plaintiffs have suffered an identifiable and distinct injury or damages to their business or property.

367.    As a result of the Dickinson Defendants' actions, Plaintiffs suffered injuries and are entitled to an award of treble damages.

<u>**FOURTH CLAIM FOR RELIEF**</u>

**(RICO § 1962(c) alternatively with Vermillion Ranch**

**Limited Partnership, Anne Filbert and Victor Tocanini as the Enterprise)**

368.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 to 367 as set forth above.

369.    This claim arises under RICO, 18 U.S.C. § 1962(c), against the Dickinson Defendants.

370.     At all times relevant to this complaint, the Dickinson Defendants were persons as defined in RICO by 18 U.S.C. § 1961(3).

371.     The Dickinson Defendants were employed by or associated with the enterprise comprised of Vermillion Ranch Limited Partnership, Anne Filbert and Victor Tocanini.

372.     At all times relevant to this complaint, the Dickinson Defendants knowingly and willfully participated in the conduct of the enterprise's affairs by engaging in a pattern of racketeering activity.

373.     The Dickinson Defendants willfully and knowingly committed the following predicate acts: 18 U.S.C. § 1546 (visa fraud), 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1592 (unlawful conduct with documents), 18 U.S.C. § 1951 (extortion) and/or Colo. Rev. Stat. § 18-3-207 (criminal extortion), and 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud).

374.     As a direct, intended and foreseeable result of the Dickinson Defendants' violations of RICO, Plaintiffs have suffered an identifiable and distinct injury or damages to their business or property.

375.     As a result of the Dickinson Defendants' actions, Plaintiffs suffered injuries and are entitled to an award of treble damages.

## FIFTH CLAIM FOR RELIEF

### (RICO § 1962(d) Conspiracy)

376.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 to 375 as set forth above.

377.     This claim arises under RICO, 18 U.S.C. § 1962(d), against the Dickinson Defendants.

378.     At all times relevant to this complaint, the Dickinson Defendants were persons as defined in RICO by 18 U.S.C. § 1961(3).

379.     Since at least 2003, the Dickinson Defendants conducted an organized and unlawful worker exploitation scheme for the purpose of obtaining pecuniary gain.

380.     In order to perpetrate this unlawful worker exploitation scheme, the Dickinson Defendants conspired to violate RICO, 18 U.S.C. § 1962(c), by knowing about and, on information and belief, agreeing to the commission of the following predicate acts: 18 U.S.C. § 1546 (visa fraud), 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1592 (unlawful conduct with documents), 18 U.S.C. § 1951 (extortion) and/or Colo. Rev. Stat. § 18-3-207 (criminal extortion), and 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud).

381.     As a direct, intended and foreseeable result of the Dickinson Defendants' violations of RICO, Plaintiffs have suffered an identifiable and distinct injury or damages to their business or property.

382.     As a result of the Dickinson Defendants' actions, Plaintiffs suffered injuries and are entitled to an award of treble damages.

## SIXTH CLAIM FOR RELIEF

### (Colorado Wage Statute)

383.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 to 382 as set forth above.

384.     This claim arises under Colo. Rev. Stat. § 8-4-101 *et seq.*, against Defendants.

385.    Defendants refused to pay wages or compensation to Plaintiffs Elieser Yael Velásquez and Sergio Velásquez in accordance with Colo. Rev. Stat. § 8-4-109.

386.    Plaintiffs Elieser Yael Velásquez and Sergio Velásquez made a written demand for wages within sixty days after their separation from Defendants, as required by Colo. Rev. Stat. § 8-4-109(3), stating in the demand where payment was to be received.

387.    Defendants failed to mail the wages owed within ten days after receipt of the demand as required by within Colo. Rev. Stat. § 8-4-109(3).

388.    As a consequence, Plaintiffs Elieser Yael Velásquez and Sergio Velásquez are entitled to receive an additional amount equal to fifty percent of their unpaid wages, pursuant to Colo. Rev. Stat. § 8-4-109(3).

## SEVENTH CLAIM FOR RELIEF

### (Breach of Contract Claim)

389.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 to 388 as set forth above.

390.    Defendants entered into an employment contract with Plaintiffs.

391.    Defendants breached this employment contract by failing to comply with the terms and conditions of this contract.

392.    Moreover, Defendants' actions were willful and wanton in that they committed such actions purposefully or they must have realized that their actions were done heedlessly and recklessly, without regard to the consequences or to the rights of Plaintiffs.

393.    As a result, Plaintiffs suffered injuries.

## EIGHTH CLAIM FOR RELIEF

### (False Imprisonment Claim)

394.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 to 393 as set forth above.

395.     Defendants intentionally restricted the freedom of movement of Plaintiffs directly or indirectly through fear by making threats against them and/or by confiscating their identification documents, holding their wages, restricting their communication and making transportation inaccessible to them.

396.     Defendants had no privilege to restrict the freedom of movement of Plaintiffs.

397.     Plaintiffs did not consent to the confinement and were conscious that their freedom of movement was restricted.

398.     Moreover, Defendants' actions had attendant circumstances of fraud or malice, or were otherwise willful and wanton in that they committed such actions purposefully or they must have realized that their actions were done heedlessly and recklessly, without regard to the consequences or to the rights of Plaintiffs.

399.     On information and belief, Defendants had a tacit understanding to consciously conspire and deliberately pursue a common plan or design that resulted in these wrongful actions against Plaintiffs pursuant to Colo. Rev. Stat. § 13-21-111.5(4).

400.     As a result of Defendants' wrongful actions and omissions, Plaintiffs have suffered injuries.

## NINTH CLAIM FOR RELIEF

### (Outrageous Conduct)

401.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 to 400 as set forth above.

402.    Defendants engaged in a course of conduct that constituted extreme and outrageous conduct against Plaintiffs Elieser Yael Velásquez, Sergio Velásquez and Humberto Berrocal.

403.    Defendants acted recklessly or with the intent of causing Plaintiffs Elieser Yael Velásquez, Sergio Velásquez and Humberto Berrocal severe emotional distress.

404.    Moreover, Defendants' actions were willful and wanton in that they committed such actions purposefully or they must have realized that their actions were done heedlessly and recklessly, without regard to the consequences or to the rights of Plaintiffs Elieser Yael Velásquez, Sergio Velásquez and Humberto Berrocal.

405.    On information and belief, Defendants had a tacit understanding to consciously conspire and deliberately pursue a common plan or design that resulted in these wrongful actions against Plaintiffs Elieser Yael Velásquez, Sergio Velásquez and Humberto Berrocal, pursuant to Colo. Rev. Stat. § 13-21-111.5(4).

406.    As a result of Defendants' wrongful actions and omissions, Plaintiffs Elieser Yael Velásquez, Sergio Velásquez and Humberto Berrocal have suffered severe emotional distress.

## TENTH CLAIM FOR RELIEF

### (Promissory Estoppel Claim Against Defendants)

407.    Plaintiffs reallege and incorporate by reference the allegations set

forth in paragraphs 1 to 406 as set forth above.

408.    Defendants made promises to Plaintiffs about their work in the United States on the H-2A visa.

409.    Defendants should have reasonably expected that such promises would induce action and/or forbearance by Plaintiffs.

410.    Plaintiffs were induced to act and/or refrained from acting based on such promises made by Defendants.

411.    Defendants broke their promises to Plaintiffs.  As a result, Plaintiffs suffered injuries.

412.    Injustice can only be avoided by the enforcement of Defendants' promises.

### DEMAND FOR JURY TRIAL

413.    Plaintiffs demand a jury for all issues so triable.

### PRAYER FOR RELIEF

414.    Plaintiffs respectfully request that this Court enter an order:

a)    assuming jurisdiction of this case;

b)    granting judgment against Defendants for having violated the FLSA and awarding Plaintiffs their unpaid minimum and/or overtime wages and a like amount as liquidated damages;

c)    granting judgment against Defendants for having violated the TVPRA claims and awarding the relevant Plaintiffs damages;

d)      granting judgment against the Dickinson Defendants for having violated RICO, 18 U.S.C. § 1962(c) and/or 18 U.S.C. § 1962(d) and awarding Plaintiffs treble damages pursuant to 18 U.S.C. § 1964(c);

e)      granting judgment against Defendants for having violated the Colorado Wage Statute and awarding the relevant Plaintiffs penalties under the Colorado Wage Statute;

f)      granting judgment against Defendants for having breached their contract with Plaintiffs and awarding Plaintiffs damages flowing from the breach;

g)      granting judgment against Defendants on Plaintiffs' claims of false imprisonment and awarding Plaintiffs damages;

h)      granting judgment against Defendants on the relevant Plaintiffs' claims of extreme and outrageous conduct and awarding the relevant Plaintiffs damages;

i)      granting judgment against Defendants on Plaintiffs' claims of promissory estoppel and awarding Plaintiffs damages;

j)      awarding Plaintiffs costs;

k)      awarding Plaintiffs prejudgment and post-judgment interest; and

l)      granting such other relief as this Court deems just and proper.

This 1st day of June 2006.

Respectfully Submitted,

 s/Kimi Jackson_____

Kimi Jackson
**Colorado Legal Services**
**Migrant Farm Worker Division**
424 Pine Street, Suite 105
Fort Collins, CO  80524-2421
Tel. (970) 407-7018
Fax (970) 493-3758
kjackson@colegalserv.org


  s/Jennifer J. Lee_____
Jennifer J. Lee
**Colorado Legal Services**
**Migrant Farm Worker Division**
1905 Sherman Street, Suite 400
Denver, CO 80203
Tel. (303) 866-9366
Fax (303) 830-7860
jlee@colegalserv.org


  s/Patricia Medige_____
Patricia Medige
**Colorado Legal Services**
**1905 Sherman Street, Suite 400**
Denver, CO 80203
Tel. (303) 866-9366
Fax (303) 830-7860
pmedige@colegalserv.org


**Attorneys for Plaintiffs**