**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 06-cv-1043-WYD-MJW

ELIESER YAEL VELÁSQUEZ CATALÁN,
SERGIO VELÁSQUEZ CATALÁN,
HUMBERTO HERALDO BERROCAL ORTIZ,
LUIS ALEJANDRO FUENTES SANDOVAL,
OSCAR SANDOVAL POBLETE, and
FREDDY VASQUEZ VARGAS,

      Plaintiffs,

v.

VERMILLION RANCH LIMITED PARTNERSHIP,
A. WRIGHT DICKINSON III,
PAULINE DICKINSON,
DEANN DICKINSON,
T. WRIGHT DICKINSON,
MARC DICKINSON, and
JEAN MARIE DICKINSON.

      Defendants.

---

# FIRST AMENDED COMPLAINT

---

## PRELIMINARY STATEMENT

    1.    Plaintiffs Elieser Yael Velásquez Catalán, Sergio Velásquez Catalán, Humberto

Heraldo Berrocal Ortiz, Luis Alejandro Fuentes Sandoval, Oscar Sandoval Poblete, and Freddy

Vasquez Vargas ("Plaintiffs") are six Chilean cattle herders who came to work in Colorado on

visas Defendants procured for them.

    2.    Plaintiffs agreed to come work on Defendants' ranch believing that they would

have good jobs and earn money to help their families back in Chile.  Defendants, however,

controlled Plaintiffs' visas and hence their ability to be lawfully employed in the United States, and wrongfully used this power to exploit Plaintiffs' working conditions.  Defendants took advantage of Plaintiffs, controlling Plaintiffs' documents, money, and freedom of movement, resulting in acts of discrimination against, and in some cases the forced labor of Plaintiffs.

3.      Plaintiffs bring this action to recover damages for injuries inflicted by Defendants under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.,* the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1589 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, the Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-101 *et seq.*, and common law claims under Colorado law for breach of contract, false imprisonment, outrageous conduct and promissory estoppel.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337 (commerce), 29 U.S.C. § 216 (FLSA), 18 U.S.C. § 1595 (TVPRA), 18 U.S.C. § 1962 (RICO) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' related claims under Colorado law.

5.      Venue is proper pursuant to 28 U.S.C. § 1391.  A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Colorado and many of the Defendants are residents of Colorado.

## PARTIES

**A.      PLAINTIFFS**

6.      Plaintiffs are citizens of Chile and were employed by Defendants as temporary foreign agricultural workers on visas which were applied for by Defendants.

7.      Plaintiff Elieser Yael Velásquez Catalán was employed by Vermillion Ranch Limited Partnership from approximately June 3, 2003 through June 14, 2005 within the meaning of 29 U.S.C. § 203(g).

8.      Plaintiff Elieser Yael Velásquez Catalán was an employee as defined by Colo. Rev. Stat. § 8-4-101(4).

9.      Plaintiff Sergio Velásquez Catalán was employed by Vermillion Ranch Limited Partnership from approximately April 16, 2004 through June 14, 2005 within the meaning of 29 U.S.C. § 203(g).

10.     Plaintiff Sergio Velásquez Catalán was an employee as defined by Colo. Rev. Stat. § 8-4-101(4).

11.     Plaintiff Humberto Heraldo Berrocal Ortiz was employed by Vermillion Ranch Limited Partnership from approximately April 16, 2004 through October 28, 2005 within the meaning of 29 U.S.C. § 203(g).

12.     Plaintiff Luis Alejandro Fuentes Sandoval was employed by Vermillion Ranch Limited Partnership from approximately April 16, 2004 through November 30, 2005 within the meaning of 29 U.S.C. § 203(g).

13.     Plaintiff Oscar Sandoval Poblete was employed by Vermillion Ranch Limited Partnership from approximately July 21, 2005 through November 30, 2005 within the meaning of 29 U.S.C. § 203(g).

14.     Plaintiff Freddy Vasquez Vargas was employed by Vermillion Ranch Limited Partnership from approximately July 21, 2005 through May 1, 2006 within the meaning of 29 U.S.C. § 203(g).

B.   **D**EFENDANTS

15.   Defendant Vermillion Ranch Limited Partnership (VRLP) is a limited partnership registered in Wyo. and registered as a foreign partnership in Colorado.

16.   VRLP has a mailing address of 14883 CR 10 N., Maybell, Colorado 81640, and a street address of 609 5th Avenue W., Rock Springs, Wyo. 82901.

17.   At all times pertinent to this action, Defendant VRLP employed Plaintiffs within the meaning of 29 U.S.C. § 203(g) and Colo. Rev. Stat. § 8-4-101(5).

18.   Defendant A. Wright "Wright" Dickinson III resides in Colorado.

19.   Defendant Wright Dickinson is a partner of VRLP, and is also the registered agent for VRLP.

20.   Defendant Pauline Dickinson resides in Colorado.

21.   Defendant Pauline Dickinson is a partner of VRLP.

22.   Defendant DeAnn "Didi" Dickinson resides in Colorado.

23.   Defendant DeAnn Dickinson is a partner of VRLP.

24.   Defendant T. Wright Dickinson resides in Colorado.

25.   Defendant T. Wright Dickinson is a partner of VRLP.

26.   Defendant Marc Dickinson resides in Wyo.

27.   Defendant Marc Dickinson is a partner of VRLP.

28.   Defendant Jean Marie Dickinson resides in Wyo.

29.   Defendant Jean Dickinson is a partner of VRLP.

30.   Defendants Wright, Pauline, Marc, DeAnn, and T. Wright Dickinson participate in supervising the individual workers employed by VRLP.

31.     Defendant Jean Dickinson handles the paperwork for VRLP.

32.     As the partners of VRLP, on information and belief, Defendants Wright, Pauline, Marc, DeAnn, T. Wright, and Jean Dickinson ("Dickinson Defendants") exerted power and control over the employment of Plaintiffs.  The Dickinson Defendants participate, directly and/or indirectly in hiring, firing, establishing rates and methods of payment, scheduling work shifts, maintaining employment records and setting terms and conditions of employment relating to Plaintiffs.

33.     The Dickinson Defendants employed Plaintiffs within the meaning of 29 U.S.C. § 203(g) and Colo. Rev. Stat. § 8-4-101(5).

## STATEMENT OF FACTS

**A.     RANCHING AND TEMPORARY FOREIGN AGRICULTURAL WORKERS**

34.     Defendants own and operate a cattle ranch known as Vermillion Ranch.

35.     The ranch is principally located in northwest Colorado, in Moffat County, but it also extends into Wyo. and Utah.

36.     For at least the past six years, Defendants have acquired a steady supply of Chilean workers to work on their ranch with H-2A visas.

37.     The H-2A program enables employers to hire foreign workers to come to the U.S. to perform temporary agricultural work.  8 U.S.C. § 1188.  The U.S. Department of Labor (U.S. DOL) oversees a regulatory scheme which is supposed to ensure that U.S. workers are given preference over foreign workers for the positions.  To the extent H-2A workers are employed, U.S. DOL also ensures that their employment does not adversely affect the compensation and

working conditions of U.S. workers.  *See generally Alfred L. Snapp & Sons, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 594-596 (1982).

38.     The goal of these U.S. DOL regulations is to protect U.S. workers by preventing employers from lowering standards through the employment of foreign workers.  Regulations found at 20 C.F.R. § 655.100 *et seq.* govern the contents of the job offers that must be made to both U.S. and temporary foreign workers.

39.     The regulations stipulate certain benefits that must be included in the job offer, including, but not limited to: (a) transportation and subsistence expenses to and from the worker's home; (b) the prevailing wage, the adverse effect wage rate or the legal federal or state minimum wage rate, whichever is highest; and (c) coverage by workers' compensation insurance.  20 C.F.R. § 655.102.

40.     As a part of the job offers for all H-2A workers, employers must attest that they will abide by the assurances in 20 C.F.R. § 655.103.

41.     Employer assurances pursuant to 20 C.F.R. § 655.103 include a promise to comply with applicable federal, state, and local employment-related laws and regulations.

42.     As a special subset of the H-2A program, employers who are seeking workers for the range production of livestock are exempt from certain requirements.  20 CFR § 655.93(b) and (c).  U.S. DOL has issued special guidance which it applies only in the case of H-2A applications with job offers requesting workers for the range production of livestock.  U.S. DOL Field Memo 24-01 (Aug. 1, 2001).

43.     Employers hiring workers for the range production of livestock are subject to certain exceptions, such as: (a) housing that meets the standards for "range housing" rather than

6

the regular housing under 20 C.F.R. § 655.102(b); (b) the ability to negotiate a longer-term contract of up to three years; and (c) upon mutual agreement between employer and employee, the payment of monthly instead of bi-monthly wages.  *Id.*

44.     Employers who hire H-2A workers in the range production of livestock pay a wage lower than that for other agricultural work, though such employers are required to provide food that is free of cost.  *Id.*; 20 C.F.R. § 655.102(b)(9).  In Colorado, for example, the minimum monthly wage for those performing range production of livestock was $750 per month since June 2005, while the minimum hourly wage for other agricultural workers on H-2A visas was $8.93 per hour in 2005.

45.     All H-2A job offers are incorporated by regulation and by operation of law into the contracts under which workers are employed.  29 C.F.R. § 501.10(d); 20 C.F.R. § 655.102(b)(14).

### B.     DEFENDANTS' SYSTEM OF EXPLOITATION AND CONTROL

46.     All of Defendants' H-2A workers are from Chile and seek to come to the U.S. as H-2A workers because of acute economic need.

47.     Defendants' H-2A workers use their wages for basic needs such as support for their families and the education of their children.

48.     Defendants, through their local recruiter in Santiago, Chile, Victor Tocanini, recruit workers from Chile, South America, promising them work for three years.

49.     Defendants, through Victor Tocanini, deceive their Chilean recruits such as Plaintiffs about the work and the terms and conditions of employment at VRLP.

50.     Once the Chilean recruits have accepted employment with Defendants, Defendants obtain H-2A visas for these workers.

51.     Defendants also enter into employment contracts with their H-2A workers.

52.     Defendants apply for H-2A visas under the special subset of H-2A visas available for workers performing the range production of livestock.

53.     Defendants' H-2A workers rarely if ever have been to the U.S. before and do not speak English.

54.     Defendants' H-2A workers are unfamiliar with the laws and customs in the U.S.

55.     Due to their vastly different lifestyle in Chile, the majority of Defendants' H-2A workers do not know how to drive an automobile.

56.     Defendants' strategy has been to completely and systematically dominate their H-2A workers by preying on their temporary immigration status and economic vulnerability.

57.     Upon arrival to the U.S., Defendants' H-2A workers, such as the Plaintiffs, find out that the working conditions are different from what was promised.

58.     Defendants confiscate their H-2A workers' passports, visas, and departure records (I-94 Forms) from their possession.

59.     Defendants do not pay their H-2A workers in any kind of negotiable instrument or cash that workers can access until their departure from the U.S.

60.     Defendants provide their H-2A workers with a monthly pay statement showing the monthly earnings and deductions.

61.     During some months, due to the deductions, Defendants' H-2A workers have

negative balances, meaning that rather than earning wages, they end the month owing money to the Defendants.

62.     If the H-2A worker has a positive balance on the monthly pay statement, Defendants deposit this money into a bank account which the worker cannot access.

63.     Defendants' H-2A workers have no bank documents, account numbers, or access to their passports or other identification which would allow them to access their accounts.

64.     Defendants' H-2A workers cannot send money to their families in Chile without the permission and the assistance of the Dickinson Defendants.

65.     Vermillion Ranch is vast and in an isolated location and the workers have no access to transportation, telephone service or mail service unless provided by the Dickinson Defendants.

66.     Once the H-2A workers are taken to their housing on the ranch, their freedom of movement is restricted.

67.     The Dickinson Defendants tell each H-2A worker that he may not leave his housing and surrounding work area, nor visit any other workers during his free time.

68.     This rule of staying near one's housing and surrounding work area applies even when an H-2A worker has no job duties that would require him to be present near his work area on a standby basis.

69.     Many of the Defendants' H-2A workers primarily perform duties that are neither on the range nor production of livestock, the tasks for which these visas were intended.

70.     Defendants' H-2A workers perform tasks that include, but are not limited to, breaking wild horses, cutting posts in the forest for the construction of corrals, driving heavy

machinery, mechanical work, harvesting cultivated fields, and building a landscaped flower bed and planting flowers for a personal residence of the Dickinson Defendants.

71.     Defendants require their H-2A workers to work seven days per week, ten to sixteen hours per day, even during those periods when workers have set schedules and are not performing tasks that require them to be on call 24 hours per day.

72.     Defendants give their H-2A workers no day off, except for less than a half-day rest on Christmas day each year.

73.     Workers are paid $800 or $850 per month, before any deductions are taken.

74.     The Dickinson Defendants have wrongfully threatened their H-2A workers that they will be sent back to Chile.

75.     Defendants' H-2A workers believe that if they are sent back to Chile in this manner, they will probably never be able to come back to the U.S. as an H-2A worker, even with a different employer.

76.     Defendants establish and maintain total domination of their H-2A workers through a system of control which deprives the workers, such as Plaintiffs, of their rights under federal, state, and local employment-related laws and regulations.

**C.    PLAINTIFFS**

**1.    Elieser Yael Velásquez Catalán**

77.     Plaintiff Elieser Yael Velásquez Catalán was recruited by Victor Tocanini to work on Vermillion Ranch.

78.     In or around mid-May 2003, via telephone from Santiago, Victor Tocanini told Mr. Yael Velásquez that: (1) he would work on a ranch in the U.S.; (2) he would work with cattle; and (3) the job would be for three years.

79.     During the course of the telephone conversation referenced in paragraph 78, Victor Tocanini omitted from Mr. Yael Velásquez material facts about the true working conditions on the Vermillion Ranch, including, but not limited to, the confiscation of his passport and documents, the holding of his pay, the long hours of work and the restriction on his freedom of movement.

80.     During the course of the telephone conversation referenced in paragraph 78, Victor Tocanini told Mr. Yael Velásquez that he would receive pay of more than $1,000 per month and that the accommodations and treatment on the ranch were good.

81.     On or around June 2, 2003, in Santiago, Victor Tocanini repeated the promises made to Mr. Yael Velásquez in paragraphs 78 through 80.

82.     In reliance on these promises, Mr. Yael Velásquez accepted the work with Defendants.

83.     Mr. Yael Velásquez paid expenses to travel from his hometown of Bahía Murta to Santiago, Chile.

84.     Mr. Yael Velásquez paid Victor Tocanini money to cover his H-2A visa and other processing fees in order to come to the U.S.

85.     On or around February 2003, Defendant Jean Dickinson, signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.

86.     The application referenced in the preceding paragraph was approved by U.S. DOL.

87.     On information and belief, an H-2A visa was issued to Mr. Yael Velásquez pursuant to the application and approval referenced in paragraphs 85 and 86.

88.     Mr. Yael Velásquez's initial H-2A visa was valid from May 20, 2003 through November 30, 2003.

89.     By nature of these promises and the job offer, Defendants entered into an employment contract with Mr. Yael Velásquez.

90.     Mr. Yael Velásquez flew from Santiago, Chile and arrived in Rock Springs, Wyo. on June 3, 2003.

91.     Upon arrival, Defendant Jean Dickinson confiscated Mr. Yael Velásquez's passport and H-2A visa.

92.     On or about June 13, 2003, Defendant Jean Dickinson took Mr. Yael Velásquez to the Rock Springs National Bank in Rock Springs, and told him to sign a piece of paper that contained writing in English, which Mr. Yael Velásquez could not read.

93.     The paper that Mr. Yael Velásquez signed authorized members of the Wright Dickinson Family to deposit and/or withdraw money from his account.

94.     Defendant Jean Dickinson took Mr. Yael Velásquez to the Social Security Office in Rock Springs, where he obtained a Social Security Card pursuant to his H-2A visa.

95.     Defendant Jean Dickinson confiscated Mr. Yael Velásquez's Social Security Card and all of his bank documents.

96.     At the ranch, Defendant Marc Dickinson told Mr. Yael Velásquez that he could never leave the ranch.

97.     Defendant Marc Dickinson is fluent in Spanish.

98.     Defendant Marc Dickinson told Mr. Yael Velásquez that he had to stay in the area of his housing and workstation, even if his job duties did not require him to be on-call on a standby basis.

99.     During Mr. Yael Velásquez's time at the ranch, he performed some work that included taking care of cattle out on the range.

100.    The majority of his time on the ranch, however, was spent performing work that did not include taking care of cattle out on the range and did not require his constant attendance out on the range on a standby basis.

101.    Mr. Yael Velásquez, for example, performed work such as cutting poles for the construction of a corral and constructing a decorative rock and cement landscaping retaining wall at Defendants Pauline and Wright Dickinson's house.

102.    While employed at Vermillion Ranch, Mr. Yael Velásquez worked approximately ten to eighteen hours per day, seven days per week.

103.    For the vast majority of his time on the ranch, Mr. Yael Velásquez had a fixed work schedule set by Defendants that was based on the work he was performing at the time.

104.    The only time off Mr. Yael Velásquez received while employed at Vermillion Ranch was three to four free hours on Christmas Day, 2003 and 2004.

105.    While employed at Vermillion Ranch, Defendants never paid Mr. Yael Velásquez with any kind of negotiable instrument or cash.

106.     Defendants provided Mr. Yael Velásquez with a monthly pay statement on or around the beginning of the month.

107.     Each pay statement showed that Mr. Yael Velásquez's gross earnings were $800 per month, before deductions.

108.     Defendants misled Mr. Yael Velásquez about the proper wage for the work that he was performing by providing false and deceptive pay statements.

109.     Monthly deductions from Mr. Yael Velásquez's pay statement included approximately $150 for food and $50 for tax withholdings.

110.     Most pay statements show additional deductions for items such as clothing and tea.

111.     Pay statements from June 2003 and July 2003 show that Mr. Yael Velásquez owed money to the ranch for these months because Defendants had deducted the cost of his airfare from Chile as well as food, work clothes, and other expenses.

112.     While Defendants eventually reimbursed Mr. Yael Velásquez for his airfare approximately three months after his arrival, they never reimbursed him for other costs he had expended to come to the U.S.

113.     When there was a positive balance, Defendants deposited this money into Rock Springs National Bank.

114.     Mr. Yael Velásquez was unable to withdraw money from Rock Springs National Bank as Defendants never gave him his bank documents, account number, or access to his identification documents.

115.    Mr. Yael Velásquez could send money home to Chile only with the permission and the assistance of the Dickinson Defendants.

116.    Mr. Yael Velásquez sometimes did not have access to a telephone for long periods of time.

117.    Certain housing and work areas on Vermillion Ranch are isolated and do not have telephones.

118.    Defendant Marc Dickinson told Mr. Yael Velásquez that he was not allowed to leave his housing and work area unless told to do so by one of the Dickinson Defendants.

119.    Sometimes, in order to use a telephone, Mr. Yael Velásquez would ride a horse, traveling several hours to cross the mountains during the night, to access a telephone on another part of Vermillion Ranch.

120.    Mr. Yael Velásquez would travel several hours by horseback to return to his housing by sunrise so that the Dickinson Defendants would not know that he had left his housing and work area in order to use a telephone.

121.    Mr. Yael Velásquez believed that the Dickinson Defendants would be very angry if they knew he had left his housing in order to use the telephone.

122.    During the time that Mr. Yael Velásquez was working on Vermillion Ranch, his H-2A visa had been extended several times until November 30, 2005.

123.    On or around October 3, 2003, February 4, 2004, October 1, 2004 and February 7, 2005, Defendant Jean Dickinson signed, under the penalty of perjury, applications for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.

124.     The applications referenced in the preceding paragraph were approved by U.S. DOL.

125.     On information and belief, the H-2A visa extensions that had been issued to Mr. Yael Velásquez were pursuant to these applications and approvals in paragraphs 123 and 124.

126.     Due to the many injustices on the ranch, Mr. Yael Velásquez and his brother, Plaintiff Sergio Velásquez Catalán, who also worked on the ranch, made the decision to leave the ranch.

127.     During the week of June 6, 2005, Messrs. Yael Velásquez and Sergio Velásquez told Defendant Marc Dickinson that they wished to leave the ranch.

128.     Messrs. Yael Velásquez and Sergio Velásquez asked Defendant Marc Dickinson for their pay for the years that they had worked on the ranch, and told Defendant Marc Dickinson that they wanted to return to Chile.

129.     Messrs. Yael Velásquez and Sergio Velásquez also asked Defendant Marc Dickinson for their bank records and money, and asked to know how much money they had in their accounts.

130.     Defendant Marc Dickinson refused to provide Messrs. Yael Velásquez and Sergio Velásquez with their bank records and money.

131.     Defendant Marc Dickinson said that Messrs. Yael Velásquez and Sergio Velásquez could not have plane tickets to leave the ranch until at least thirty days had passed.

132.     The Dickinson Defendants sent Messrs. Yael Velásquez and Sergio Velásquez back to their housing and work area, next to the corral that they were building.

133.    Defendant Marc Dickinson ordered Messrs. Yael Velásquez and Sergio Velásquez to continue working on the corral.

134.    Before being sent back to their housing and work area, Defendant Marc Dickinson ordered Messrs. Yael Velásquez and Sergio Velásquez to assist him in taking some horses and saddles to the garage near the house of Pauline and Wright Dickinson

135.    Messrs. Yael Velásquez and Sergio Velásquez no longer had access to horses.

136.    Defendant Wright Dickinson transported Messrs. Yael Velásquez and Sergio Velásquez back to their housing and work area.

137.    During the ride, Messrs. Yael Velásquez and Sergio Velásquez asked Defendant Wright Dickinson to send Defendant Marc Dickinson who is fluent in Spanish to talk with them, because they wanted to leave the ranch.

138.    As directed, Messrs. Yael Velásquez and Sergio Velásquez continued to work on the corral.

139.    There was no telephone at Messrs. Yael Velásquez and Sergio Velásquez's housing and work area.

140.    The closest town to Messrs. Yael Velásquez and Sergio Velásquez's housing and work area was Rock Springs, Wyo., more than sixty miles away.

141.    Approximately three days later, Messrs. Yael Velásquez and Sergio Velásquez attempted to speak with the Dickinson Defendants about leaving Vermillion Ranch.

142.    Messrs. Yael Velásquez and Sergio Velásquez only means of transportation was a small skid steer tractor that they used for building the corral.

143.    Messrs. Yael Velásquez and Sergio Velásquez put all of their belongings in the bucket of the skid steer tractor.  Mr. Sergio Velásquez rode in the bucket of the tractor with the belongings, and Mr. Yael Velásquez drove the tractor for approximately three hours over gravel roads until they arrived at the home of Defendants Wright and Pauline Dickinson.

144.    Messrs. Yael Velásquez and Sergio Velásquez did not have access to a telephone at the home of Defendants Wright and Pauline Dickinson because Defendant T. Wright Dickinson removed the telephone from the garage.

145.    Mr. Yael Velásquez told Defendant Marc Dickinson that Messrs. Yael Velásquez and Sergio Velásquez wanted their money, and that they wanted to return to Chile.

146.    Defendant Marc Dickinson told Messrs. Yael Velásquez and Sergio Velásquez that if they wanted to leave the ranch, he would call immigration and have them deported.

147.    Defendant Marc Dickinson refused to give Messrs. Yael Velásquez and Sergio Velásquez their passports, immigration documents, and money.

148.    Mr. Yael Velásquez has two friends who live in Boulder, Colorado.

149.    Defendant Marc Dickinson told Mr. Yael Velásquez that if Messrs. Yael Velásquez and Sergio Velásquez left the ranch, he would have the police and immigration place the Boulder friends under surveillance.

150.    Defendant Marc Dickinson transported Messrs. Yael Velásquez and Sergio Velásquez back to their housing and work area next to the corral.

151.    Defendant Marc Dickinson told Messrs. Yael Velásquez and Sergio Velásquez to keep building the corral.

152.    Messrs. Yael Velásquez and Sergio Velásquez stayed in their camp for five or six days without other human contact.

153.    Messrs. Yael Velásquez and Sergio Velásquez feared for the safety of the Boulder friends, and for their own safety.

154.    Messrs. Yael Velásquez and Sergio Velásquez continued working.

155.    Using a mobile telephone belonging to a man hunting near Messrs. Yael Velásquez and Sergio Velásquez's camp, on or around June 14, 2005, Mr. Yael Velásquez called several friends and arranged a rescue in the middle of the night.

156.    Messrs. Yael Velásquez and Sergio Velásquez were rescued from the ranch in the early morning hours of June 15, 2005.

157.    Messrs. Yael Velásquez and Sergio Velásquez left the ranch without their passports, immigration documents, and money.

158.    Via a letter dated July 20, 2005 and sent to Defendants, Messrs. Yael Velásquez and Sergio Velásquez requested that their documents and their pay be sent to them at a safe address.

159.    Messrs. Yael Velásquez and Sergio Velásquez did not let Defendants know where they were living, because they feared the threats that had been made against them and their friends.

160.    Defendants received the letter on August 1, 2005.

161.    Defendants, through their immigration attorney Anne Filbert, sent a return letter dated August 9, 2005, refusing to give Messrs. Yael Velásquez and Sergio Velásquez their money and documents.

162.     Ms. Filbert's letter stated that she had spoken with a prosecuting attorney with the U.S. Immigration and Customs Enforcement office about Messrs. Yael Velásquez and Sergio Velásquez's deportation.

163.     Defendants failed to return the pay belonging to Messrs. Yael Velásquez and Sergio Velásquez within ten days of their written demand.

164.     Due to the abuse he suffered on Vermillion Ranch at the hands of Defendants, Mr. Yael Velásquez has suffered severe emotional distress.

**2.     Sergio Velásquez Catalán**

165.     Plaintiff Sergio Velásquez Catalán was recruited by Victor Tocanini to work on Vermillion Ranch.

166.     In or around February, March and April, 2004, via several telephone calls from Santiago, Victor Tocanini told Mr. Sergio Velásquez that: (1) he would work on a ranch in the U.S.; (2) he would work with cattle; and (3) the job would be for three years.

167.     During the course of the telephone conversations referenced in paragraph 166, Victor Tocanini omitted from Mr. Sergio Velásquez material facts about the true working conditions on the Vermillion ranch, including, but not limited to, the confiscation of his passport and documents, the holding of his pay, the long hours, and the restriction on his freedom of movement.

168.     During the course of the telephone conversations referenced in paragraph 166, Victor Tocanini told Mr. Sergio Velásquez that the work was good.

169.    On or around April 15, 2004, in Santiago, Victor Tocanini repeated the promises made to Mr. Sergio Velásquez in paragraphs 166 through 168 and stated that he would be paid $1,100 per month.

170.    Mr. Sergio Velásquez accepted work with Defendants.

171.    Mr. Sergio Velásquez paid expenses to travel from his hometown Bahía Murta to Santiago, Chile.

172.    Mr. Sergio Velásquez paid for lodging and subsistence expenses to stay overnight in Santiago, Chile to wait for arrangements to be completed.

173.    Mr. Sergio Velásquez paid Victor Tocanini money to cover his H-2A visa and other processing fees in order to come to the U.S.

174.    On or around February 2, 2004, Defendant Jean Dickinson signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.

175.    The application referenced in the preceding paragraph, was approved by U.S. DOL.

176.    On information and belief, an H-2A visa was issued to Mr. Sergio Velásquez pursuant to the application and approval referenced in paragraphs 174 and 175.

177.    Mr. Sergio Velásquez's initial H-2A visa was valid from April 14, 2004 through November 30, 2004.

178.    By nature of these promises and the job offer, Defendants entered into an employment contract with Mr. Sergio Velásquez.

179.     Mr. Sergio Velásquez flew from Santiago, Chile and arrived in Rock Springs, Wyo. on April 16, 2004.

180.     Upon arrival, Defendant Jean Dickinson confiscated Mr. Sergio Velásquez's passport and H-2A visa.

181.     Mr. Sergio Velásquez arrived at Vermillion Ranch with five other H-2A workers from Chile.

182.     At the ranch, Defendants Marc and Jean Dickinson called a meeting of the new workers.

183.     Defendant Marc Dickinson told the new workers that Defendants would:

(1)     hold the workers' passports, immigration documents and Social Security Cards;

(2)     return such documents and pay them after the end of the three year contract period;

(3)     require that each worker stay in his area of his housing and work area, even though his job duties did not require him to be on-call on a standby basis;

(4)     prohibit workers from leaving the ranch for any reason; and

(5)     send back to his home country any worker who left his housing and work area no matter what kind of work he was doing.

184.     Defendant Jean Dickinson took Mr. Sergio Velásquez to the Rock Springs National Bank in Rock Springs, and told him to sign a piece of paper that contained writing in English, which Mr. Sergio Velásquez could not read.

185.     The paper that Mr. Sergio Velásquez signed authorized members of the Wright Dickinson Family to deposit and/or withdraw money from his account.

186.    Defendant Jean Dickinson also took Mr. Sergio Velásquez to the Social Security Office in Rock Springs, where he obtained a Social Security Card pursuant to his H-2A visa.

187.    Defendant Jean Dickinson confiscated Mr. Sergio Velásquez's Social Security Card and all of his bank documents.

188.    Mr. Sergio Velásquez's visit with Defendant Jean Dickinson to Rock Springs was the only time that Mr. Sergio Velásquez left Vermillion Ranch during the fourteen months that he worked for VRLP.

189.    During Mr. Sergio Velásquez's time at the ranch, he performed some work that included taking care of cattle out on the range.

190.    The majority of his time on the ranch, however, was spent performing work that did not include taking care of cattle out on the range and did not require his constant attendance out on the range on a standby basis.

191.    Mr. Sergio Velásquez, for example, performed work such as cutting poles for the construction of a corral and driving a tractor.

192.    While employed at Vermillion Ranch, Mr. Sergio Velásquez worked approximately ten to eighteen hours per day, seven days per week.

193.    Almost the entire time that he was on Vermillion Ranch, Mr. Sergio Velásquez had a fixed work schedule that Defendants set based on the work he was performing at the time.

194.    Mr. Sergio Velásquez received three or four hours of free time on Christmas Day, 2004.

195.    While employed at Vermillion Ranch, Defendants never paid Mr. Sergio Velásquez with any kind of negotiable instrument or cash.

196.    Defendants provided Mr. Sergio Velásquez with a monthly pay statement on or around the beginning of each month.

197.    Each pay statement shows that Mr. Sergio Velásquez's gross earnings were $800 per month, before deductions.

198.    Defendants misled Mr. Sergio Velásquez about the proper wage for the work that he was performing by providing false and deceptive pay statements.

199.    Monthly deductions from Mr. Sergio Velásquez's paycheck included approximately $150 for food and $50 in tax withholdings.

200.    Most pay statements show additional deductions for items such as clothing and tea.

201.    Pay statements from April 2004, May 2004, and June 2004, show that Mr. Sergio Velásquez owed money to the ranch for these months because Defendants had deducted the cost of his airfare from Chile as well as food, work clothes, and other expenses.

202.    While Defendants eventually reimbursed Mr. Sergio Velásquez for his airfare approximately three months after his arrival, they never reimbursed him for other costs he had expended to come to the U.S.

203.    When there was a positive balance, Defendants deposited this money into Rock Springs National Bank.

204.    Mr. Sergio Velásquez was unable to withdraw money from Rock Springs National Bank without having his bank documents, account number, and access to his identification documents.

205.    Mr. Sergio Velásquez could send money home only with the permission and the assistance of the Dickinson Defendants.

206.    The Dickinson Defendants received Mr. Sergio Velásquez's private mail.

207.    Mr. Sergio Velásquez received a package from his wife that one of the Dickinson Defendants, on information and belief, had opened prior to giving it to Mr. Sergio Velásquez.

208.    Several times, Mr. Sergio Velásquez had to travel at night for several hours by horseback through the mountains in order to access a telephone.

209.    Defendant Marc Dickinson had told Mr. Sergio Velásquez that he would be sent back to Chile if he left his housing and work area.

210.    Mr. Sergio Velásquez believed that the Dickinson Defendants would be very angry if they knew he had left his housing at night in order to use the telephone.

211.    During the time that Mr. Sergio Velásquez was working on Vermillion Ranch, his H-2A visa had been extended several times until November 30, 2005.

212.    On or around October 1, 2004 and February 7, 2005, Defendant Jean Dickinson signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.

213.    The applications referenced in the preceding paragraph were approved by U.S. DOL.

214.    On information and belief, the H-2A visa extensions that had been issued to Mr. Sergio Velásquez were pursuant to these applications and approvals in paragraphs 212 and 213.

215.     As described in paragraphs 126 through 157, Mr. Sergio Velásquez decided to leave the ranch due to the many injustices on the ranch and was not able to escape from Vermillion Ranch until June 15, 2005.

216.     As described in paragraphs 157 through 162, Defendants, through their attorney, denied Mr. Sergio Velásquez's request for his documents and money.

217.     Due to the abuse he suffered on Vermillion Ranch at the hands of Defendants, Mr. Sergio Velásquez has suffered severe emotional distress.

**3.      Humberto Heraldo Berrocal Ortiz**

218.     Plaintiff Humberto Heraldo Berrocal Ortiz was recruited by Victor Tocanini to work on Vermillion Ranch.

219.     In or around mid-March, 2004, via telephone from Santiago, Victor Tocanini told Mr. Berrocal that: (1) he would work on a ranch in the U.S.; (2) he would work with cattle; and (3) the job would be for three years.

220.     During the course of the telephone conversation referenced in the preceding paragraph, Victor Tocanini omitted from Mr. Berrocal material facts about the true working conditions on the Vermillion ranch, including, but not limited to, the confiscation of his passport and documents, the holding of his pay, the long hours and the restriction on his freedom of movement.

221.     Mr. Berrocal accepted the work with Defendants.

222.     Mr. Berrocal paid expenses to travel from his hometown of Coyhaique to Santiago, Chile.

223.    Mr. Berrocal paid for lodging and subsistence expenses to stay overnight in Santiago, Chile to wait for arrangements to be completed.

224.    Mr. Berrocal paid Victor Tocanini money to cover his H-2A visa and other processing fees in order to come to the U.S.

225.    On or around February 4, 2004, Defendant Jean Dickinson, signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.

226.    The application referenced in the preceding paragraph was approved by U.S. DOL.

227.    On information and belief, an H-2A visa was issued to Mr. Berrocal pursuant to the application and approval referenced in paragraphs 225 and 226.

228.    Mr. Berrocal's initial H-2A visa was valid from April 14, 2004 through November 30, 2004.

229.    By nature of these promises and the job offer, Defendants entered into an employment contract with Mr. Berrocal.

230.    Mr. Berrocal flew from Santiago, Chile and arrived in Rock Springs, Wyo. on April 16, 2004.

231.    Upon his arrival, Defendant Jean Dickinson confiscated Mr. Berrocal's passport and H-2A visa.

232.    Defendant Jean Dickinson took Mr. Berrocal to the Rock Springs National Bank in Rock Springs, and told him to sign a piece of paper that contained writing in English, which Mr. Berrocal could not read.

233.    The paper that Mr. Berrocal signed authorized members of the Wright Dickinson Family to deposit and/or withdraw money from his account.

234.    Defendant Jean Dickinson took Mr. Berrocal to the Social Security Office in Rock Springs, where he obtained a Social Security Card pursuant to his H-2A visa.

235.    Defendant Jean Dickinson confiscated Mr. Berrocal's Social Security Card and all of his bank documents.

236.    Mr. Berrocal was told about the rules on the Vermillion Ranch as described in paragraphs 182 and 193.

237.    During Mr. Berrocal's time at the ranch, he performed some work that included taking care of cattle out on the range.

238.    The majority of his time on the ranch, however, was spent performing work that did not include taking care of cattle out on the range and did not require his constant attendance out on the range on a standby basis.

239.    Mr. Berrocal, for example, performed work such as painting gates for the construction of corrals.

240.    While employed at Vermillion Ranch, Mr. Berrocal worked approximately twelve to eighteen hours per day, seven days per week.

241.    Almost the entire time that he was on the ranch, Mr. Berrocal had a fixed work schedule set by Defendants that was based on the work he was performing at the time.

242.    Mr. Berrocal received three or four hours of free time on Christmas Day, 2004.

243.    While employed at Vermillion Ranch, Defendants never paid Mr. Berrocal with any kind of negotiable instrument or cash.

244.    Defendants provided Mr. Berrocal with a monthly pay statement on or around the beginning of each month.

245.    Each pay statement showed that Mr. Berrocal's gross earnings were $800 per month, before deductions.

246.    Defendants misled Mr. Berrocal about the proper wage for the work that he was performing by providing false and deceptive pay statements.

247.    Monthly deductions included approximately $150 for food and $50 per for tax withholdings.

248.    Most pay statements show additional deductions for items such as clothing, tea, and cigarettes.

249.    Pay statements from April 2004, May 2004 and June 2004 show that Mr. Berrocal owed money to the ranch for these months because Defendants had deducted the cost of his airfare from Chile as well as food, work clothes, and other expenses.

250.    While Defendants eventually reimbursed Mr. Berrocal for his airfare approximately three months after his arrival, they never reimbursed him for other costs he had expended to come to the U.S.

251.    When there was a positive balance, Defendants deposited this money into Rock Springs National Bank.

252.    Mr. Berrocal was unable to withdraw money from this account without having his bank documents, account number, or access to his identification documents.

253.    Mr. Berrocal could send money home only with the permission and the assistance of the Dickinson Defendants.

254.    On or around April 27, 2004, Mr. Berrocal was thrown from a horse and kicked, and he became unconscious.

255.    Mr. Berrocal's head was bleeding and he and he had a broken nose.

256.    Immediately following the injury, the Dickinson Defendants did not take Mr. Berrocal to a medical facility.

257.    Instead, Defendant Marc Dickinson ordered Mr. Berrocal to continue working.

258.    For several days, Mr. Berrocal experienced dizziness, headaches, abdominal pain, and chest pain.

259.    After seven or eight days had passed, Mr. Berrocal began bleeding profusely from his nose and mouth.

260.    A co-worker pleaded with Defendant Marc Dickinson to take Mr. Berrocal to the hospital.

261.    Defendant Marc Dickinson took Mr. Berrocal to the emergency room in Rock Springs.

262.    A doctor advised Mr. Berrocal to rest and return for follow-up care.

263.    When they returned to the ranch, Defendant Marc Dickinson ordered Mr. Berrocal to work after one day of rest.

264.    The Dickinson Defendants did not take Mr. Berrocal back to a medical facility for follow-up treatment.

265.    The Dickinson Defendants did not report the injury to their workers' compensation insurance carrier.

266.    After the injury, Defendant Marc Dickinson told Mr. Berrocal that he was not worth anything as an employee and should be sent back to Chile.

267.    Mr. Berrocal feared being sent back to Chile because he believed that he would not be able to obtain a future visa to work in the U.S.

268.    In June 2005, Mr. Berrocal spoke with an attorney at Colorado Legal Services, and told the attorney that he was still in poor health as a result of his injury a year earlier.

269.    At Mr. Berrocal's request, the attorney submitted notice of the workers' compensation claim to the Division of Workers' Compensation.

270.    In September 2005, Defendant Marc Dickinson and his wife interviewed Mr. Berrocal on videotape, asking questions about the injury and his experiences on the ranch.

271.    Defendant Marc Dickinson told Mr. Berrocal that if he spoke with the attorney, he had to tell the attorney that he did not want to continue working with the attorney and that he otherwise should not have any more contact with the attorney.

272.    Mr. Berrocal was intimidated and feared pursuing any claim against VRLP through his attorney.

273.    The workers' compensation insurance company set a doctor's appointment for Mr. Berrocal on September 15, 2005, in Craig, Colorado.

274.    Prior to the appointment, Defendant Marc Dickinson told Mr. Berrocal that he should tell the doctor that he was feeling fine and could work, and that his injuries were caused by an accident he had earlier in Chile.

275.    Defendant Pauline Dickinson drove Mr. Berrocal to the doctor's appointment, and sat in the room with him during the interview with the doctor.

276.    Mr. Berrocal feared that if he did not do as he was told, Defendant Marc Dickinson would deport him back to Chile, and he would not receive any compensation or treatment for his injury nor would he ever be able to obtain another H-2A job in the U.S.

277.    While the workers' compensation claim was pending, Mr. Berrocal did not receive any mail relating to the claim.

278.    Upon information and belief, the Dickinson Defendants received the workers' compensation mailings and failed to give them to Mr. Berrocal.

279.    On October 18, 2005, Defendant Marc Dickinson told Mr. Berrocal that he had to sign a letter stating that Mr. Berrocal did not want his attorney to represent him anymore.

280.    Because he was fearful of being sent back to Chile, Mr. Berrocal signed the letter described in the preceding paragraph and did not attempt to use the mail or telephone to communicate with his attorney.

281.    During the time that Mr. Berrocal was on the ranch, his H-2A visa had been extended several times until November 30, 2005.

282.    On or around October 1, 2004 and February 7, 2005, Defendant Jean Dickinson, signed, under the penalty of perjury, applications for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.

283.    These applications referenced in the preceding paragraph were approved by U.S. DOL.

284.    On information and belief, the H-2A visa extensions that had been issued to Mr. Berrocal were pursuant to these applications and approvals in paragraphs 282 and 283.

285.     In October 2005, a man who was hunting in the area of Vermillion Ranch assisted Mr. Berrocal in accessing communication in order to escape.

286.     Mr. Berrocal escaped from the ranch in the middle of the night on October 28, 2005.

287.     Mr. Berrocal left the ranch without his passport, immigration documents and money.

288.     During the eighteen months that he was on Vermillion Ranch, Mr. Berrocal left the ranch a total of three times.  The first time was a trip to the bank and Social Security Office in Rock Springs.  The second time was for medical attention in Rock Springs, and the third time was for a doctor's appointment scheduled by the workers' compensation insurance company.

289.     Due to the abuse he suffered on Vermillion Ranch at the hands of Defendants, Mr. Berrocal has suffered severe emotional distress.

**4.      Luis Alejandro Fuentes Sandoval**

290.     Plaintiff Luis Alejandro Fuentes Sandoval was recruited by Victor Tocanini to work on Vermillion Ranch.

291.     In or around February, March and April 2004, via telephone from Santiago, and in person in Santiago, Victor Tocanini told Mr. Fuentes that: (1) he would work on a ranch in the U.S.; (2) he would work with cattle; and (3) the job would be for three years.

292.     During the course of these conversations referenced in paragraph 291, Victor Tocanini omitted material facts from Mr. Fuentes about the true working conditions on Vermillion ranch, including, but not limited to, the confiscation of his passport and documents, the holding of his pay, the long hours and the restriction on his freedom of movement.

293.    During the course of these conversations referenced in paragraph 291, Victor Tocanini told Mr. Fuentes that he would work about eight hours per day.

294.    In reliance on these promises, Mr. Fuentes accepted this work with Defendant

295.    Mr. Fuentes paid expenses to travel from his hometown of Coyhaique to Santiago, Chile.

296.    Mr. Fuentes paid for lodging and subsistence expenses to stay overnight in Santiago, Chile to wait for arrangements to be completed.

297.    Finally, Mr. Fuentes paid Victor Tocanini money to cover his H-2A visa and other processing fees in order to come to the U.S.

298.    On or around February 4, 2004, Defendant Jean Dickinson, signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.

299.    This application referenced in the preceding paragraph, was approved by U.S. DOL.

300.    On information and belief, an H-2A visa was issued to Mr. Fuentes pursuant to this application and approval in paragraphs 298 and 299.

301.    His initial H-2A visa was valid from approximately April 14, 2004 through November 30, 2004.

302.    By nature of these promises and the job offer, Defendants entered into an employment contract with Mr. Fuentes.

303.    Mr. Fuentes flew from Santiago, Chile and arrived in Rock Springs, Wyo. on April 16, 2004.

304.    Upon arrival, Defendants Marc and Jean Dickinson confiscated his passport and H-2A visa.

305.    Defendants Marc and Jean Dickinson told Mr. Fuentes was told that his documents would be returned to him after one day.

306.    Mr. Fuentes was scared not to have his documents, as he believed that without them, he was illegally here in the U.S.

307.    Defendant Jean Dickinson took Mr. Fuentes to the Rock Springs National Bank in Rock Springs, and told him to sign a piece of paper that contained writing in English, which Mr. Fuentes could not read.

308.    The paper Mr. Fuentes signed authorized members of the Wright Dickinson Family to deposit and/or withdraw money from his account.

309.    Defendant Jean Dickinson took Mr. Fuentes to the Social Security Office in Rock Springs, where he obtained a Social Security Card pursuant to his H-2A visa.

310.    Defendant Jean Dickinson confiscated Mr. Fuentes's Social Security Card and all of his bank documents.

311.    As described in paragraphs 182 and 183, Mr. Fuentes was told about the rules on the ranch.

312.    During Mr. Fuentes's time at the ranch, he never performed work that involved taking care of cattle out on the range that required his constant attendance out on the range on a standby basis.

313.    Mr. Fuentes, for example, performed work in the mechanic shop, repairing tractors and vehicles.

314.    While employed at Vermillion Ranch, Mr. Fuentes generally worked approximately eleven to thirteen hours per day, seven days per week with a set work schedule.

315.    The Dickinson Defendants told Mr. Fuentes that he would have a day of rest on Christmas Day, 2004.

316.    On Christmas Day, 2004, Mr. Fuentes had to work for several hours since Defendant T. Wright Dickinson made him feed animals and clean the worker housing.  Mr. Fuentes ended up working an eight-hour day.

317.    While working with horses in April 2004, Mr. Fuentes severely sprained his ankle.

318.    Mr. Fuentes had to ask the Dickinson Defendants for medical care several times.

319.    Defendant Wright Dickinson took Mr. Fuentes to the hospital a day and a half after the injury occurred.

320.    At the hospital, Mr. Fuentes received x-rays and a splint for his ankle, was proscribed Percocet and was referred to an orthopedist for follow-up care the following week.

321.    At the hospital, Defendant Wright Dickinson spoke for Mr. Fuentes.

322.    The doctor at the hospital ordered approximately fifteen days of rest.

323.    Mr. Fuentes returned to the ranch the same day in the evening.

324.    The Dickinson Defendants ordered Mr. Fuentes to continue to work the next morning, using only one foot, without any rest to recover from his injury.

325.    Mr. Fuentes worked every day attempting to keep his injured ankle away from the ground or floor.  Mr. Fuentes experienced considerable pain during this time.

326.    Defendants did not take Mr. Fuentes to the orthopedist or to any medical facility for follow-up treatment.

327.    Mr. Fuentes had to remove his own splint without receiving medical care.

328.    On information and belief, Defendants did not report this injury to their workers' compensation insurance carrier.

329.    Mr. Fuentes continues to experience pain in his foot and ankle area.

330.    In or around December 2004, Mr. Fuentes injured his eye while welding in the mechanic shop.

331.    Mr. Fuentes requested medical attention several times before Defendant Pauline Dickinson took him to the doctor three days after the injury.

332.    The doctor removed pieces of metal from Mr. Fuentes' eye.

333.    Upon his return to the ranch, Defendants ordered Mr. Fuentes to return to work without resting.

334.    Defendants did not report Mr. Fuentes' eye injury to their workers' compensation insurance carrier.

335.    Defendants did not pay Mr. Fuentes with any kind of negotiable instrument or cash until his last day on the ranch.

336.    Defendants provided Mr. Fuentes with a pay statement on or around the beginning of each month.

337.    Each pay statement showed that Mr. Fuentes' gross earnings were $800 per month, before deductions.

338.    Defendants misled Mr. Fuentes about the proper wage for the work he was performing by providing false and deceptive pay statements.

339.    Monthly deductions from Mr. Fuentes' pay statement included approximately $150 for food and $50 for tax withholdings.

340.    Most pay statements show deductions for items such as clothing and tea.

341.    Pay statements from April 2004, May 2004 and June 2004 show that Mr. Fuentes owed money to the ranch for these months because Defendants had deducted the cost of his airfare from Chile as well as food, work clothes and other expenses.

342.    While Defendants eventually reimbursed Mr. Fuentes for his airfare approximately three months after his arrival, they never reimbursed him for other costs he had expended to come to the U.S.

343.    When there was a positive balance, Defendants deposited this money into Rock Springs National Bank.

344.    Mr. Fuentes was unable to withdraw money from the Rock Springs National Bank without having his bank documents, account number, and access to his passport or Social Security Card.

345.    Mr. Fuentes could send money home only with the permission and the assistance of the Dickinson Defendants.

346.    The entire time that Mr. Fuentes was on the ranch, he lived in a little house by the mechanic shop adjacent to the home of Defendants Pauline and Wright Dickinson.

347.    Mr. Fuentes' housing had no toilet or shower.

348.    Mr. Fuentes slept in a tiny room with two other workers.

349.     During the time Mr. Fuentes was on the ranch, his H-2A visa had been extended several times until November 30, 2005.

350.     On or around October 1, 2004 and February 7, 2005, Defendant Jean Dickinson signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.

351.     These applications referenced in the preceding paragraph were approved by U.S. DOL.

352.     On information and belief, the H-2A visa extensions that had been issued to Mr. Fuentes were pursuant to these applications and approvals in paragraphs 350 and 351.

353.     Mr. Fuentes often had to ask the Defendants for permission to use the telephone.

354.     Defendants sometimes physically removed workers' access to the telephone.

355.     On or around October 25, 2005, Defendant T. Wright Dickinson arrived at Mr. Fuentes' housing and insisted that Mr. Fuentes and the other workers go to work before their normal starting time of 7:00 a.m.

356.     Mr. Fuentes told Defendant T. Wright Dickinson that they worked sufficient hours in the mechanic shop by beginning at 7:00 a.m.

357.     Shortly after the interchange described in paragraphs 355 and 356, Defendant T. Wright Dickinson removed the telephone from the mechanic shop for the remainder of Mr. Fuentes' time on Vermillion Ranch.

358.     On or around November 30, 2005, Defendant T. Wright Dickinson told Mr. Fuentes and his uncle, Plaintiff Oscar Sandoval Poblete, that they were being sent back to Chile.

359.     Defendant T. Wright Dickinson told Mr. Fuentes and Mr. Sandoval that their work period at Vermillion Ranch had ended.

360.     Mr. Fuentes had worked at Vermillion Ranch for 18 months.

361.     On November 30, 2005, the Dickinson Defendants placed Messrs. Fuentes and Sandoval on a plane to Chile.

362.     Upon his sudden return to Chile, Mr. Fuentes had difficulty in finding new employment.

**5.     Oscar Sandoval Poblete**

363.     Plaintiff Oscar Sandoval Poblete was recruited by Victor Tocanini to work on Vermillion Ranch.

364.     In or around July 2005, via telephone from Santiago, Victor Tocanini told Mr. Sandoval that: (1) he would work on a ranch in the U.S.; (2) he would work with cattle; and (3) the job would be for three years.

365.     During the course of the telephone conversation referenced in paragraph 364, Victor Tocanini omitted material facts from Mr. Sandoval about the true working conditions on the Vermillion Ranch, including, but not limited to, the confiscation of his passport and documents, the holding of his pay, the long hours and the restriction on his freedom of movement.

366.     During the course of the telephone conversation referenced in paragraph 364, Victor Tocanini told Mr. Sandoval that the work on Vermillion Ranch would be good and on a schedule similar to that in Chile, with a day of rest on Sundays.

367.     Mr. Sandoval accepted this work with Defendants.

368.    Mr. Sandoval paid expenses to travel from his hometown of Coyhaique to Santiago, Chile.

369.    Mr. Sandoval paid for two nights of lodging and subsistence expenses to stay in Santiago, Chile to wait for arrangements to be completed.

370.    Mr. Sandoval paid Victor Tocanini money to cover his H-2A visa and other processing fees in order to come to the U.S.

371.    On or around February 7, 2005, Defendant Jean Dickinson, signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.

372.    This application referenced in the preceding paragraph was approved by U.S. DOL.

373.    On information and belief, an H-2A visa was issued to Mr. Sandoval pursuant to this application and approval in paragraphs 371 and 372.

374.    Mr. Sandoval's initial H-2A visa was issued through November 30, 2005.

375.    By nature of these promises and the job offer, Defendants entered into an employment contract with Mr. Sandoval.

376.    Mr. Sandoval flew from Santiago, Chile and arrived in Rock Springs, Wyo. on July 21, 2005.

377.    Upon arrival, Defendant Pauline Dickinson confiscated Mr. Sandoval's passport and H-2A visa.

378.     Defendant Jean Dickinson took Mr. Sandoval to the Rock Springs National Bank in Rock Springs, and told him to sign a piece of paper that contained writing in English, which Mr. Sandoval could not read.

379.     The paper that Mr. Sandoval signed authorized members of the Wright Dickinson Family to deposit and/or withdraw money from his account.

380.     Defendant Jean Dickinson took Mr. Sandoval to the Social Security Office in Rock Springs, where he obtained a Social Security Card pursuant to his H-2A visa.

381.     Defendant Jean Dickinson confiscated Mr. Sandoval's Social Security Card and all of his bank documents.

382.     Defendant T. Wright Dickinson instructed Mr. Sandoval on the rules of Vermillion Ranch and told Mr. Sandoval that he: (1) was not allowed to leave the ranch; (2) was not allowed to leave his work area; and (3) must work during all daylight hours.

383.     During Mr. Sandoval's time at the ranch, he never performed work that involved taking care of cattle out on the range and his work did not require his constant attendance out on the range on a standby basis.

384.     While employed at Vermillion Ranch, Mr. Sandoval worked seven days per week, approximately eleven to thirteen hours per day.

385.     Mr. Sandoval had a fixed work schedule set by Defendants.

386.     Defendants did not pay Mr. Sandoval with any kind of negotiable instrument or cash until his last day on the ranch.

387.     Defendants provided him with a monthly pay statement on or around the beginning of the month.

388.    Each pay statement showed that Mr. Sandoval's gross earnings were $800 per month, before deductions.

389.    Defendants misled Mr. Sandoval about the proper wage for the work he was performing by providing false and deceptive pay statements.

390.    Monthly deductions included approximately $150 for food and $50 for tax withholdings.

391.    Most pay statements show additional deductions for items such as clothing and tea.

392.    Pay statements from July 2005, August 2005 and September 2005 show that Mr. Sandoval owed money to Defendants for these months because Defendants had deducted the cost of his airfare from Chile as well as food, work clothes, and other expenses.

393.    While Defendants eventually reimbursed Mr. Sandoval for his airfare approximately three months after his arrival, they never reimbursed him for other costs he had expended to come to the U.S.

394.    When there was a positive balance, Defendants deposited this money into Rock Springs National Bank.

395.    Mr. Sandoval was unable to withdraw money from this account without having his bank documents, account number, and access to his identification documents.

396.    Mr. Sandoval could send money home only with the permission and the assistance of the Dickinson Defendants.

397.    The entire time that Mr. Sandoval was on the ranch, he lived in a little house by the mechanic shop adjacent to the home of Defendants Pauline and Wright Dickinson.

398.    This housing had no toilet or shower.

399.    Mr. Sandoval slept in a tiny room with two other workers.

400.    After the argument referenced in paragraphs 355 through 357, the Dickinson Defendants removed the telephone for the remainder of Mr. Sandoval's time on Vermillion Ranch.

401.    As stated in paragraphs 358 through 361, the Dickinson Defendants sent Mr. Sandoval back to Chile.

402.    Mr. Sandoval had worked on the ranch for 4 months.

403.    Upon his sudden return to Chile, Mr. Sandoval had difficulty in finding new employment.

**6.    Freddy Vasquez Vargas**

404.    Plaintiff Freddy Vasquez Vargas was recruited by Victor Tocanini to work on Vermillion Ranch.

405.    In or around June and July 2005, via telephone from Santiago, Victor Tocanini told Mr. Vasquez that:  (1) he would work on a ranch in the U.S.; (2) he would work with cattle; and (3) the job would be for three years.

406.    During the course of this telephone conversation referenced in paragraph 405, Victor Tocanini omitted material facts from Mr. Vasquez about the true working conditions on the Vermillion ranch, including, but not limited to, the confiscation of his passport and documents, the holding of his pay, the long hours and the restriction on his freedom of movement.

407.    On or around July 17 through 20, 2005, in Santiago, Victor Tocanini repeated the promises made to Mr. Vasquez in paragraphs 405 and 406.

408.    In reliance on these promises, Mr. Vasquez accepted this work with Defendants.

409.    Mr. Vasquez paid expenses to travel from his hometown of Bahía Murta to Santiago, Chile.

410.    Mr. Vasquez paid for lodging and subsistence expenses to stay several nights in Santiago, Chile to wait for arrangements to be completed.

411.    Mr. Vasquez paid Victor Tocanini money to cover his H-2A visa and other processing fees in order to come to the U.S.

412.    On or around February 7, 2005, Defendant Jean Dickinson, signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.

413.    This application referenced in the preceding paragraph was approved by U.S. DOL.

414.    On information and belief, an H-2A visa was issued to Mr. Vasquez pursuant to this application and approval in paragraphs 412 and 413.

415.    Mr. Vasquez's initial H-2A visa was issued through November 30, 2005.

416.    By nature of these promises and the job offer, Defendants entered into an employment contract with Mr. Vasquez.

417.    Mr. Vasquez flew from Santiago, Chile and arrived in Rock Springs, Wyo. on July 21, 2005.

418.    Upon arrival, Defendant Pauline Dickinson confiscated Mr. Vasquez's passport and H-2A visa.

419.    Some weeks after his arrival on the ranch, Defendant Jean Dickinson took Mr. Vasquez to the Rock Springs National Bank in Rock Springs, and told him to sign a piece of paper that contained writing in English, which Mr. Vasquez could not read.

420.    On information and belief, the paper that Mr. Vasquez signed authorized members of the Wright Dickinson Family to deposit and/or withdraw money from his account.

421.    Defendant Jean Dickinson took Mr. Vasquez to the Social Security Office in Rock Springs, where he obtained a Social Security Card pursuant to his H-2A visa.

422.    Defendant Jean Dickinson confiscated Mr. Vasquez's Social Security Card and all of Mr. Vasquez's bank documents.

423.    During Mr. Vasquez's time at the ranch, he never performed work that involved taking care of cattle out on the range and his work did not require his constant attendance out on the range on a standby basis.

424.    While employed at Vermillion Ranch, Mr. Vasquez worked seven days per week, approximately eleven to twelve hours per day, with a set work schedule.

425.    Almost the entire time that he was on Vermillion Ranch, Mr. Vasquez had a fixed work schedule set by Defendants that was based on the work he was performing at the time.

426.    Mr. Vasquez received three or four hours of free time on Christmas Day, 2005.

427.    Defendants did not pay Mr. Vasquez with any kind of negotiable instrument or cash until his last day on the ranch.

428.    Defendants provided him with a monthly pay statement on or around the beginning of the month.

429.    Each pay statement showed Mr. Vasquez's gross earnings before deductions.

430.    Through November 2005, Mr. Vasquez's earnings were $800 per month.

431.    Beginning in December 2005, his earnings were $850 per month.

432.    Defendants misled Mr. Vasquez about the proper wage for the work he was performing by providing false and deceptive pay statements.

433.    Monthly deductions included approximately $150 for food and $50 per for tax withholdings.

434.    Pay statements from July 2005, August 2005 and September 2005 show that Mr. Vasquez owed money to Defendants for these months because Defendants had deducted the cost of his airfare from Chile as well as food, work clothes, and other expenses.

435.    While Defendants eventually reimbursed Mr. Vasquez for his airfare approximately three months after his arrival, they never reimbursed him for other costs he had expended to come to the U.S.

436.    When there was a positive balance, Defendants deposited this money into Rock Springs National Bank.

437.    Mr. Vasquez was unable to withdraw money from Rock Springs National Bank without having his bank documents, account number, and access to his identification documents.

438.    Mr. Vasquez could send money home only with the permission and the assistance of the Dickinson Defendants.

439.    For the first months that Mr. Vasquez was on the ranch, he lived in a little house by the mechanic shop adjacent to the home of Defendants Pauline and Wright Dickinson.

440.    This housing had no toilet or shower,

441.    Mr. Vasquez slept in a tiny room with two other workers and had to sleep in an armchair.

442.    The Dickinson Defendants sometimes denied Mr. Vasquez access to the telephone and to a telephone card.

443.    After the interchange in paragraphs 355 through 357, the Dickinson Defendants removed the telephone from the mechanic shop for the remainder of Mr. Vasquez's time on Vermillion Ranch.

444.    After the Dickinson Defendants removed the telephone from the mechanic shop, Mr. Vasquez made repeated requests to use the telephone of Defendants Pauline and Wright Dickinson in order to tend to a medical emergency involving his infant son.

445.    Mr. Vasquez learned that his infant son who lived in Chile was ill with fever, pneumonia and the beginnings of asthma.

446.    Over the course of three to four days, Defendant DeAnn Dickinson repeatedly denied Mr. Vasquez's requests to use the telephone in paragraph 444 in order to attend to his infant son's medical emergency.

447.    In or around February 2006, the Dickinson Defendants sent Mr. Vasquez to live in a remote area located next to Brown's Park National Wildlife Refuge, in order to work in a hay field.

448.    Mr. Vasquez's housing and work area were separated from the rest of Vermillion Ranch by the Green River.

449.    The housing and work area described in paragraphs 447 and 448 did not have a telephone.

450.    The housing and work area described in paragraphs 447 and 448 was more than fifty miles from the nearest town.

451.    Mr. Vasquez had no access to transportation.

452.    Mr. Vasquez had not had any contact with his family or heard any news of his infant son for months.

453.    Mr. Vasquez's made multiple requests to use Defendant T. Wright Dickinson's cellular telephone.

454.    Defendant T. Wright Dickinson repeatedly denied Mr. Vasquez's requests.

455.    On or around April 2, 2006, after 5 p.m., Mr. Vasquez crossed the Green River by floating in a metal barrel and by using a shovel.

456.    Mr. Vasquez found a metal barrel, which he welded to reduce leakage.

457.    After crossing the Green River, Mr. Vasquez walked for approximately two hours until he was able to access a telephone on a part of Vermillion Ranch.

458.    Mr. Vasquez returned to his housing and work area after using the telephone.

459.    On or around April 3, 2005, Defendant T. Wright Dickinson told Mr. Vasquez that if he ever left his housing and work area again he would be deported.

460.    Mr. Vasquez, attempting to protect the workers who lived near the telephone that he had used in paragraph 457, said that he had been fishing in the river.

461.    Defendant T. Wright Dickinson told Mr. Vasquez that if he fished in the river the police would put him in prison for fishing without a license.

462.    At this time, Mr. Vasquez's job duties did not involve taking care of animals and did not require him to be at his work site on a standby basis.

463.    On April 4, 2006, a uniformed officer in an official vehicle with an insignia parked close to Mr. Vasquez's housing and watched him.

464.    On information and belief, the officer was a refuge law enforcement officer employed by Brown's Park National Wildlife Refuge.

465.    The officer watched Mr. Vasquez for three or four days in a row.

466.    Mr. Vasquez made the decision to leave the ranch.

467.    Mr. Vasquez continued working and had no way to leave the ranch.  He continued working for approximately one week without opportunity speak with the Dickinson Defendants or leave by any other means.

468.    During that time, Mr. Vasquez had anxiety and difficulty sleeping and eating.

469.    Approximately one week later Mr. Vasquez, desperate to leave the ranch, asked Defendant T. Wright Dickinson for return passage to Chile.

470.    Defendants provided Mr. Vasquez with his plane ticket, as required by the H-2A regulations.

471.    Defendant T. Wright Dickinson searched Mr. Vasquez's luggage before he left for the airport in Rock Springs Wyoming.

472.    During the time that Mr. Vasquez was on Vermillion Ranch, his H-2A visa was extended until March 31, 2006.

473.    In or around October 2005, Defendant Jean Dickinson signed, under the penalty of perjury, an application for temporary foreign labor certification agreeing to abide by assurances outlined in 20 C.F.R. § 655.103.

474.    On information and belief, this application in the preceding paragraph was approved by U.S. DOL.

475.    On information and belief, the H-2A visa extension that had been issued to Mr. Vasquez was pursuant to this application and approval in paragraphs 473 and 474.

476.    Due to the abuse he suffered on Vermillion Ranch at the hands of Defendants, Mr. Vasquez has suffered severe emotional distress.

**D.    FAIR LABOR STANDARDS ACT**

477.    Workers principally engaged in the range production of livestock are exempted from the minimum wage and overtime requirements of FLSA.  29 U.S.C. § 213(a)(6)(E).

478.    During their employment, however, Plaintiffs were principally engaged in work other than the range production of livestock as defined by FLSA.

479.    Plaintiffs primarily performed work that was close to headquarters and/or did not require constant attendance out on the range on a standby basis.

480.    Plaintiffs were not principally engaged in activities that would make the computation of hours difficult.

481.    During certain workweeks, Plaintiffs performed some work that was not agricultural work as defined by FLSA.

482.    Plaintiffs worked, on average, ten to eighteen hours per day, seven days

per week.

483.    Defendants provided Plaintiffs with pay statements indicating that they were earning a set monthly salary of $800 or $850 per month.

484.    Based on the hours worked by Plaintiffs, Defendant VRLP used a pay rate of approximately $2 to $3 per hour, before deductions.

485.    During their employment at Vermillion Ranch, Defendants did not pay the Plaintiffs in any kind of negotiable instrument or cash until their last day at the ranch or until after they had left the ranch.

486.    All Plaintiffs paid for their travel expenses to Santiago, Chile.

487.    All Plaintiffs paid and for various costs related to the arrangement of their H-2A visas.

488.    The out-of-pocket expenses referenced in paragraphs 486 and 487 were for the benefit of the employer.

489.    Defendants took deductions, as shown on Plaintiffs' pay statements, for expenses such as the airline flight, work clothes, work boots and work gloves, all of which were items for the benefit of the employer.

490.    Defendants took other deductions that were, on information and belief, not at actual cost.

491.    During some months, Plaintiffs' pay statements indicated that they had a negative balance due to deductions, making Plaintiffs indebted to Defendants.

**E.    RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)**

492.    The Dickinson Defendants conducted an organized and unlawful worker exploitation scheme for the purpose of obtaining pecuniary gain which resulted in injury to the Plaintiffs.

493.    The Dickinson Defendants fraudulently obtained H-2A workers, making it possible for them to tightly control these workers through a series of intimidating acts, threats and retaliatory conduct, all for personal profit.

494.    In order to perpetrate this unlawful worker exploitation scheme, the Dickinson Defendants willfully and knowingly committed multiple acts of racketeering activity under 18 U.S.C. § 1961, including: 18 U.S.C. § 1546 (visa fraud), 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1592 (unlawful conduct with documents), 18 U.S.C. § 1951 (extortion) and/or Colo. Rev. Stat. § 18-3-207 (criminal extortion), and 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud).

1.    **Fraudulent Visa Applications in Violation of 18 U.S.C. § 1546**

495.    In order to continually obtain a supply of foreign H-2A workers, the Dickinson Defendants knowingly and willfully devised a scheme to defraud federal agencies by making materially false statements about their job offer and their intent to comply with all federal, state and local employment-related laws and regulations.

496.    The Dickinson Defendants collectively decided to apply for H-2A visas for their workers.

497.    The Dickinson Defendants applied for H-2A visas through their immigration attorney, Anne Filbert.

498.     Federal immigration law authorizes agricultural employers to obtain H-2A visas through an application process.  8 U.S.C. § 1188.  The H-2A application consists of several parts.

499.     First, an application for temporary foreign labor certification must be submitted to the U.S. DOL and the appropriate state agency, consisting of: (1) Application for Alien Employment Certification, Form ETA 750; and (2) Agricultural and Food Process Clearance Order, Form ETA 790.

500.     U.S. DOL's approval of the application for temporary foreign labor certification verifies the need for foreign labor and the appropriateness of the wages and working conditions offered.

501.     Second, the approved labor certification, along with the Petition for a Nonimmigrant Worker, Petition I-129, is submitted to U.S. Citizenship and Immigration Services (U.S. CIS).

502.     The approved labor certification determines the number of positions and period of employment for issuance of the H-2A visas.

503.     Third, upon approval of the Petition, the employer sends the notice of approval to the U.S. DOS and one of its consulate offices issues the visas in the home country of the H-2A worker.

504.     Each H-2A application must include a copy of the job offer and an agreement to abide by assurances outlined in 20 C.F.R. § 655.103.

505.     The application for temporary foreign labor certification would not be approved without the inclusion of the job offer and assurances as required by 20 C.F.R. § 655.101(b).

506.     In submitting the H-2A applications pertinent to this complaint, Defendant Jean

Dickinson signed and submitted, under the penalty of perjury, 28 U.S.C. § 1746, Defendants' job

offer and a promise that Defendants would abide by assurances outlined in 20 C.F.R. § 655.103.

507.     Pursuant to one of the assurances outlined in 20 C.F.R. § 655.103(g), the

applicant must certify to abide by the prohibition on retaliation against H-2A workers who have

exercised or asserted their rights provided by the H-2A program.

508.     This anti-retaliation provision at 20 C.F.R. § 655.103(g) states: "[t]he employer

shall not intimidate, threaten, restrain, coerce, blacklist, discharge, or in any manner discriminate

against . . . any person who has with just cause" exercised his rights under the employment

contract.

509.     During the years pertinent to this Complaint, the Dickinson Defendants

intimidated, harassed and/or discriminated against workers who, with just cause, had raised

various rights, such as workers' compensation, wages and working conditions and who, with just

cause, had consulted a legal assistance program about their contract rights.

510.     Defendant Jean Dickinson made false statements about prohibiting retaliatory

conduct against workers despite the fact that she knew that the Dickinson Defendants' practice is

to discriminate against and intimidate H-2A workers who had, with just cause, raised their rights

under their employment contract.

511.     The assurances outlined in 20 C.F.R. § 655.103 also require that the applicants

certify that they will comply with all federal, state and local employment-related laws and

regulations, 20 C.F.R. § 655.103(b), including the regular and proper payment of wages for the

kind of work performed.

512.    During the years pertinent to this Complaint, the Dickinson Defendants failed to pay some workers the proper wage for their work, in violation of applicable employment-related laws and regulations, because some workers were not primarily engaged in the range production of livestock.  20 C.F.R. § 655.102(b)(9).

513.    H-2A workers performing agricultural work, other than the range production of livestock, were required to receive the following wages per hour in Colorado: $8.07 (2003); $8.36 (2004); $8.93 (2005) and $8.37 (2006).

514.    During the years pertinent to this Complaint, the Dickinson Defendants failed, in actuality, to pay workers with a negotiable instrument or cash, on a regular basis, as required by the applicable employment-related laws and regulations.  U.S. DOL Field Memo 24-01 (Aug. 1, 2001); 20 C.F.R. § 655.102(b)(10).

515.    Defendant Jean Dickinson made false statements about complying with the regular and proper payment of wages despite the fact that she knew that the Dickinson Defendants would not pay some workers the proper wage rate for the work performed and that Defendants would not pay all workers monthly with a negotiable instrument or cash.

516.    Applicants must provide an accurate copy of the job offer to be used for the recruitment of U.S. and H-2A workers.  20 C.F.R. § 655.101(b)(1).

517.    For all years pertinent to this Complaint, Defendant Jean Dickinson filed job descriptions for work on the ranch in the H-2A applications for December through March for an "open range winter cattleherder," describing work to be performed "exclusively out on open desert range to protect pregnant commercial cows from harsh winter conditions."

518.     For all years pertinent to this Complaint, the job description for April through November is for a "range calver" and involves the performance of duties "principally out on open range lands to attend to cows during calving and to care for their calves."

519.     By describing the work to be performed as being principally the range production of livestock, the Dickinson Defendants knew that they would be able to pay drastically less than the minimum wage, *see, e.g.*, 29 U.S.C. § 213(a)(6)(E), and benefit from some of the specialized exceptions from the H-2A regulations applied to employers who are seeking workers for the range production of livestock.  20 C.F.R. § 655.93; *see e.g.,* U.S. DOL Field Memo 24-01 (Aug. 1, 2001).

520.     During the years pertinent to this Complaint, Defendant Jean Dickinson made false statements about the job offer because she knew from the Dickinson Defendants' past practices that they would not provide work to all workers in accordance with the job offer.

521.     Without these false statements, the Dickinson Defendants would not be able to obtain H-2A workers nor would they be able to profit from the control of these workers.

522.     As described in ¶¶ 85-163 (Yael Velásquez), ¶¶ 174-216 (Sergio Velásquez), ¶¶ 225-288 (Berrocal), ¶¶ 298-362 (Fuentes), ¶¶ 371-403 (Sandoval) and ¶¶ 412-475 (Vasquez), the Dickinson Defendants knowingly and willfully made, under the penalty of perjury, material false statements about the job offer and promises to abide by assurances in 20 C.F.R. § 655.103, in multiple H-2A applications filed pursuant to the immigration laws, in order to obtain foreign labor through the H-2A program in violation of 18 U.S.C. § 1546.

523.     As described in ¶¶ 85-163 (Yael Velásquez), ¶¶ 174-216 (Sergio Velásquez), ¶¶ 225-288 (Berrocal), ¶¶ 298-361 (Fuentes), ¶¶ 371-402 (Sandoval) and ¶¶ 412-475 (Vasquez), the

Dickinson Defendants knowingly presented H-2A applications filed pursuant to the immigration laws, which contained material false statements, under the penalty of perjury, about the job offer and promises to abide by assurances in 20 C.F.R. § 655.103, in order to obtain foreign labor through the H-2A program in violation of 18 U.S.C. § 1546.

524.    As described in ¶¶ 85-163 (Yael Velásquez), ¶¶ 174-216 (Sergio Velásquez), ¶¶ 225-288 (Berrocal), ¶¶ 298-361 (Fuentes), ¶¶ 371-402 (Sandoval) and ¶¶ 412-475 (Vasquez), the Dickinson Defendants' wrongful actions of visa fraud proximately caused these Plaintiffs economic injuries.

**2.    Forced Labor & Conduct With Documents Violating 18 U.S.C. §§ 1589 & 1592**

525.    The Dickinson Defendants knowingly and willfully held workers in forced labor through their scheme of threatening workers with legal coercion to cause workers to believe that they had no choice but to continue to work for the Defendants or risk serious legal harm, including arrest and deportation.

526.    During the course of such conduct described above, the Dickinson Defendants knowingly and willfully held workers' passports and visas as part of their scheme described above in an attempt to prevent or restrict the workers' liberty to travel in order to maintain their labor and services.

527.    As described in ¶¶ 91-163 (Yael Velásquez), ¶¶ 180-216 (Sergio Velásquez), ¶¶ 231-288 (Berrocal) and ¶¶ 418-475 (Vasquez), the Dickinson Defendants knowingly and willfully committed acts of forced labor in violation of 18 U.S.C. §§ 1589-1590, constituting "racketeering activity" as defined by RICO, 18 U.S.C. § 1961(1).

528.     As described in ¶¶ 91-163 (Yael Velásquez), ¶¶ 180-216 (Sergio Velásquez), ¶¶ 231-288 (Berrocal) and ¶¶ 418-475 (Vasquez), the Dickinson Defendants knowingly and willfully committed unlawful conduct with respect to these Plaintiffs' passports and visas in furtherance of forced labor in violation of 18 U.S.C. § 1592, constituting "racketeering activity" as defined by RICO, 18 U.S.C. § 1961(1).

529.     As described in ¶¶ 91-163 (Yael Velásquez), ¶¶ 180-216 (Sergio Velásquez), ¶¶ 231-288 (Berrocal) and ¶¶ 418-475 (Vasquez), the Dickinson Defendants' wrongful actions of forced labor and unlawful conduct with respect to documents proximately caused these Plaintiffs economic injuries.

**3.      Extortion in Violation of 18 U.S.C. § 1951 & Colo. Rev. Stat. § 18-3-207**

530.     The Dickinson Defendants knowingly and willfully participated in multiple predicate acts of extortion by authorizing the wrongful use of threatened force and fear to induce workers to abandon their property rights as H-2A workers.

531.     The Dickinson Defendants wrongfully threatened workers with arrest and deportation for the pecuniary purpose of inducing workers to continue working and depriving workers of legal claims they have as H-2A workers.

532.     Defendants' H-2A workers reasonably feared losing all of their pay if they did not do as they were told since the Dickinson Defendants had control over all of their wages.

533.     Defendants' H-2A workers also feared deportation if they did not do as they were told since the Dickinson Defendants had confiscated their passports, visas and immigration documents.

534.     As described in ¶¶ 91-162 (Yael Velásquez), ¶¶ 180-216 (Sergio Velásquez), ¶¶ 231-288 (Berrocal), ¶¶ 304-329 (Fuentes) and ¶¶ 418-470 (Vasquez), the Dickinson Defendants knowingly and willfully used wrongful fear with the intent to induce these Plaintiffs to abandon their property rights, in violation of 18 U.S.C. § 1951 and/or Colo. Rev. Stat. § 18-3-207.

535.     As described in ¶¶ 91-162 (Yael Velásquez), ¶¶ 180-216 (Sergio Velásquez), ¶¶ 231-288 (Berrocal), ¶¶ 304-329 (Fuentes) and ¶¶ 418-470 (Vasquez), the Dickinson Defendants' wrongful actions of extortion proximately caused these Plaintiffs economic injuries.

**4.       Mispayment of Wages & Recruitment in Violation of Mail and/or Wire Fraud, 18 U.S.C. §§ 1341 & 1343**

536.     The Dickinson Defendants knowingly, willfully and recklessly devised a scheme to defraud workers in order to obtain their money, property, labor and/or services by deceiving them about the pay they should receive for the kind of work that they performed as well as about the terms and conditions of the job.

537.     On information and belief, the Dickinson Defendants knew that all workers would not be principally engaged in the production of livestock out on the range and knowingly, willfully and recklessly failed to systematically pay certain workers the lawful wages for their work performed.

538.     The Dickinson Defendants misled certain workers about their status and rights under FLSA by issuing pay statements indicating that the proper pay for their work performed was $800 or $850 per month prior to deductions.

539.     On information and belief, the Dickinson Defendants used the mail, telephone and/or fax machine to generate and/or send pay statements, issue checks and/or deposit and/or

transfer money in the bank as reflected on the workers' pay statements.  All of these communications were made with the purpose of executing and furthering their fraudulent scheme.

540.    On information and belief, the Dickinson Defendants authorized Victor Tocanini to recruit potential H-2A workers on their behalf in Chile, South America.

541.    On information and belief, the Dickinson Defendants authorized Victor Tocanini to promise certain workers that they will work on a temporary visa for a three-year period on the ranch working as range herders of cattle.

542.    On information and belief, the Dickinson Defendants, through Victor Tocanini, recruited workers with false representations and/or omissions about the work with the specific intent and/or reckless disregard of the truth to deceive workers about the actual pay, working conditions and nature of the work, because such deception was often necessary to recruit workers for Vermillion Ranch.

543.    In reliance on these promises, certain workers accepted employment on Vermillion Ranch as H-2A workers and were induced to travel to the U.S.

544.    The Dickinson Defendants, through their immigration attorney Anne Filbert, arranged to have H-2A visas issued for the prospective workers at the U.S. Consulate in Santiago, Chile.

545.    The Dickinson Defendants also arranged transportation from Santiago, Chile to Rock Springs, Wyoming for their H-2A workers.

546.    On information and belief, the Dickinson Defendants used the mail, telephone and/or fax machine to communicate indirectly and/or directly with their recruiting agent in Chile, Victor Tocanini and make travel arrangements.

547.    The Dickinson Defendants used the mail, telephone and/or fax machine to secure the U.S. DOL and U.S. CIS approval of their H-2A applications.

548.    The communications made in paragraphs 546-547 above were made with the purpose of executing and furthering the Dickinson Defendants' fraudulent scheme.

549.    As described in ¶¶ 77-163 (Yael Velásquez), ¶¶ 189-205 (Sergio Velásquez), ¶¶ 237-253 (Berrocal), ¶¶ 290-362 (Fuentes), ¶¶ 383-396 (Sandoval) and ¶¶ 404-471 (Vasquez), the Dickinson Defendants, through their fraudulent payment and recruitment schemes, knowingly and willfully committed acts of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 & 1343, constituting "racketeering activity" as defined by RICO, 18 U.S.C. § 1961(1).

550.    As described in ¶¶ 77-163 (Yael Velásquez), ¶¶ 189-205 (Sergio Velásquez), ¶¶ 237-253 (Berrocal), ¶¶ 290-362 (Fuentes), ¶¶ 383-396 (Sandoval) and ¶¶ 404-471 (Vasquez), the Dickinson Defendants' wrongful actions of mail and/or wire fraud proximately caused these Plaintiffs economic injuries.

**5.    RICO Enterprises**

551.    Vermillion Ranch Limited Partnership (VRLP) is a partnership and therefore an enterprise as defined by RICO, 18 U.S.C. § 1961(4).

552.    VRLP's ranching activities require the movement of goods across state lines and therefore affect interstate commerce.

553.     As described in paragraphs 14-32, the Dickinson Defendants operated or managed VRLP throughout the relevant period described in this Complaint.

554.     The Dickinson Defendants knowingly participated in the operation or management of VRLP in order to perpetrate the unlawful worker exploitation scheme.

555.     VRLP, Victor Tocanini and Anne Filbert, are a group of individuals who are associated in fact and therefore an enterprise as defined by RICO, § 1961(4).

556.     The enterprises, as described in paragraphs 551 and 555, each require the movement of goods and people across state lines and therefore affects interstate commerce.

557.     The Dickinson Defendants, using their positions as partners and operators of VRLP, have formed ongoing associations with Anne Filbert and Victor Tocanini in order to execute essential aspects of the unlawful worker exploitation scheme.

558.     The Dickinson Defendants have a continuing association with Anne Filbert to ensure U.S. DOL and U.S. CIS approval of the H-2A applications and U.S. DOS issuance of the H-2A visas.

559.     The Dickinson Defendants have a continuing association with Victor Tocanini to identify workers in Chile for recruitment and to arrange for their paperwork to come to the U.S.

560.     Through the continuing associations referenced in paragraphs 557 through 559, the Dickinson Defendants are able to bring foreign workers to the U.S.

561.     The Dickinson Defendants, using their positions as partners and operators of VRLP, operated or managed the enterprise comprised of VRLP, Anne Filbert and Victor Tocanini.

562.     The Dickinson Defendants initiated the unlawful worker exploitation scheme.

563.    The Dickinson Defendants controlled the flow of information with respect to the H-2A application process for the purposes of acquiring foreign labor for VRLP.

564.    On information and belief, the Dickinson Defendants indirectly and/or directly managed the flow of information to Victor Tocanini with respect to the terms of employment and the kinds of workers they sought to work on VRLP.

565.    The Dickinson Defendants knowingly participated in the operation or management of the enterprise comprised of VRLP, Anne Filbert and Victor Tocanini by directing the activities and managing the flow of information within the enterprise in order to perpetrate and advance the unlawful worker exploitation scheme.

**6.      Pattern of Racketeering Activity**

566.    Defendants' predicate acts of racketeering activity constitute a pattern of racketeering activity as defined in RICO, U.S.C. § 1961(5).

567.    From 2003 to the present, the Dickinson Defendants committed multiple incidents of racketeering activity comprising of forced labor, unlawful conduct with documents, mail and/or wire fraud, visa fraud and extortion against Plaintiffs and, on information and belief, against other workers as well.

568.    The Dickinson Defendants' acts of racketeering activity are interrelated in that:

(a)     They had common participants, the Dickinson Defendants;

(b)     They had common victims, the Plaintiffs;

(c)     These acts had the common purpose and result of economically benefiting the Dickinson Defendants at the expense of Plaintiffs; and

        (d)     Without the mail and/or wire fraud and visa fraud, the Dickinson

Defendants could not have successfully exploited Plaintiffs through forced

labor, unlawful conduct with documents and extortion.

569.     Since at least 2003, the Dickinson Defendants' acts of racketeering activity have

been a part of the Dickinson Defendants' regular conduct of business, and therefore, imply a

threat of continued racketeering activity.

570.     Plaintiffs fear that the Dickinson Defendants may attempt to retaliate against them

for the prosecution of this lawsuit.

## FIRST CLAIM FOR RELIEF

### (Fair Labor Standards Act)

571.     Plaintiffs reallege and incorporate by reference the allegations set forth in

paragraphs 1 through 570 as set forth above.

572.     This claim arises under FLSA, 29 U.S.C. § 201 *et seq.*, against Defendants.

573.     Defendants failed to pay Plaintiffs the required minimum and overtime wages for

their work.

574.     Defendants' violations of FLSA were willful, in that the Defendants knew or

showed reckless disregard for the issue of whether Defendants' conduct was prohibited by

FLSA.

575.     As a result, Plaintiffs suffered damages.

## SECOND CLAIM FOR RELIEF

### (Trafficking Victims Protection Reauthorization Act)

576.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 575 as set forth above.

577.    This claim arises under the TVPRA against all Defendants.

578.    Pursuant to 18 U.S.C. §§ 1589-1590, Defendants knowingly recruited, harbored, provided, or obtained by any means, Plaintiffs Elieser Yael Velásquez Catalán, Sergio Velásquez Catalán, Humberto Heraldo Berrocal Ortiz and Freddy Vasquez Vargas for labor or services by means of:

(a) a scheme, plan, or pattern intended to cause these Plaintiffs to believe that, if they did not perform such labor or services, that they or another person would suffer serious harm; or

(b) the abuse or threatened abuse of law or the legal process.

579.    As a result, these Plaintiffs suffered injuries and are entitled to recover damages pursuant to 18 U.S.C. § 1595.

## THIRD CLAIM FOR RELIEF

### (RICO § 1962(c) with Vermillion Ranch Limited Partnership as the Enterprise)

580.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 579 as set forth above.

581.    This claim arises under RICO, 18 U.S.C. § 1962(c), against the Dickinson Defendants.

582.    The Dickinson Defendants were employed by or associated with Vermillion Ranch Limited Partnership.

583.    At all times relevant to this Complaint, the Dickinson Defendants were persons as defined in RICO by 18 U.S.C. § 1961(3).

584.    At all times relevant to this Complaint, the Dickinson Defendants knowingly and willfully participated in the conduct of Vermillion Ranch Limited Partnership's affairs by engaging in a pattern of racketeering activity.

585.    The Dickinson Defendants willfully and knowingly committed the following predicate acts: 18 U.S.C. § 1546 (visa fraud), 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1592 (unlawful conduct with documents), 18 U.S.C. § 1951 (extortion) and/or Colo. Rev. Stat. § 18-3-207 (criminal extortion), and 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud).

586.    As a direct, intended and foreseeable result of the Dickinson Defendants' violations of RICO, Plaintiffs have suffered an identifiable and distinct injury or damages to their business or property.

587.    As a result of the Dickinson Defendants' actions, Plaintiffs suffered injuries and are entitled to an award of treble damages.

## FOURTH CLAIM FOR RELIEF

### (RICO § 1962(c) alternatively with Vermillion Ranch

### Limited Partnership, Anne Filbert and Victor Tocanini as the Enterprise)

588.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 587 as set forth above.

589.    This claim arises under RICO, 18 U.S.C. § 1962(c), against the Dickinson Defendants.

590.     At all times relevant to this Complaint, the Dickinson Defendants were persons as defined in RICO by 18 U.S.C. § 1961(3).

591.     The Dickinson Defendants were employed by or associated with the enterprise comprised of Vermillion Ranch Limited Partnership, Anne Filbert and Victor Tocanini.

592.     At all times relevant to this Complaint, the Dickinson Defendants knowingly and willfully participated in the conduct of the enterprise's affairs by engaging in a pattern of racketeering activity.

593.     The Dickinson Defendants willfully and knowingly committed the following predicate acts: 18 U.S.C. § 1546 (visa fraud), 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1592 (unlawful conduct with documents), 18 U.S.C. § 1951 (extortion) and/or Colo. Rev. Stat. § 18-3-207 (criminal extortion), and 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud).

594.     As a direct, intended and foreseeable result of the Dickinson Defendants' violations of RICO, Plaintiffs have suffered an identifiable and distinct injury or damages to their business or property.

595.     As a result of the Dickinson Defendants' actions, Plaintiffs suffered injuries and are entitled to an award of treble damages.

## FIFTH CLAIM FOR RELIEF

### (RICO § 1962(d) Conspiracy)

596.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 595 as set forth above.

597.     This claim arises under RICO, 18 U.S.C. § 1962(d), against the Dickinson Defendants.

598.     At all times relevant to this Complaint, the Dickinson Defendants were persons as defined in RICO by 18 U.S.C. § 1961(3).

599.     Since at least 2003, the Dickinson Defendants conducted an organized and unlawful worker exploitation scheme for the purpose of obtaining pecuniary gain.

600.     In order to perpetrate their unlawful worker exploitation scheme, the Dickinson Defendants conspired to violate RICO, 18 U.S.C. § 1962(c), by knowing about and, on information and belief, agreeing to the commission of the following predicate acts: 18 U.S.C. § 1546 (visa fraud), 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1592 (unlawful conduct with documents), 18 U.S.C. § 1951 (extortion) and/or Colo. Rev. Stat. § 18-3-207 (criminal extortion), and 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud).

601.     As a direct, intended and foreseeable result of the Dickinson Defendants' violations of RICO, Plaintiffs have suffered an identifiable and distinct injury or damages to their business or property.

602.     As a result of the Dickinson Defendants' actions, Plaintiffs suffered injuries and are entitled to an award of treble damages.

## SIXTH CLAIM FOR RELIEF

### (Colorado Wage Claim Act)

603.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 602 as set forth above.

604.     This claim arises under Colo. Rev. Stat. § 8-4-101 *et seq.*, against Defendants.

605.    Defendants refused to pay wages or compensation to Plaintiffs Elieser Yael Velásquez and Sergio Velásquez in accordance with Colo. Rev. Stat. § 8-4-109.

606.    Plaintiffs Elieser Yael Velásquez and Sergio Velásquez made a written demand for wages within sixty days after their separation from Defendants, as required by Colo. Rev. Stat. § 8-4-109(3), stating in the demand where payment was to be received.

607.    Defendants failed to tender the wages owed within ten days after receipt of the demand as required by Colo. Rev. Stat. § 8-4-109(3).

608.    As a consequence, Plaintiffs Elieser Yael Velásquez and Sergio Velásquez are entitled to receive an additional amount equal to fifty percent of their unpaid wages, pursuant to Colo. Rev. Stat. § 8-4-109(3).

## SEVENTH CLAIM FOR RELIEF

### (Breach of Contract Claim)

609.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 608 as set forth above.

610.    Defendants entered into an employment contract with Plaintiffs.

611.    Defendants breached this employment contract by failing to comply with the terms and conditions of this contract.

612.    Defendants' actions were willful and wanton in that they committed such actions purposefully or they must have realized that their actions were done heedlessly and recklessly, without regard to the consequences or to the rights of Plaintiffs.

613.    As a result, Plaintiffs suffered injuries.

**EIGHTH CLAIM FOR RELIEF**

**(False Imprisonment Claim)**

614.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 613 as set forth above.

615.    Defendants intentionally restricted the freedom of movement of Plaintiffs directly or indirectly through fear by making threats against Plaintiffs and/or by confiscating their identification documents, holding their wages, restricting their communication and making transportation inaccessible to them.

616.    Defendants had no privilege to restrict the freedom of movement of Plaintiffs.

617.    Plaintiffs did not consent to their confinement and were conscious that their freedom of movement was restricted.

618.    Moreover, Defendants' actions had attendant circumstances of fraud or malice, or were otherwise willful and wanton in that they committed such actions purposefully or they must have realized that their actions were done heedlessly and recklessly, without regard to the consequences or to the rights of Plaintiffs.

619.    On information and belief, Defendants had a tacit understanding to consciously conspire and deliberately pursue a common plan or design that resulted in wrongful actions against Plaintiffs pursuant to Colo. Rev. Stat. § 13-21-111.5(4).

620.    As a result of Defendants' wrongful actions and omissions, Plaintiffs have suffered injuries.

## NINTH CLAIM FOR RELIEF

### (Outrageous Conduct)

621.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 620 as set forth above.

622.     Defendants engaged in a course of conduct that constituted extreme and outrageous conduct against Plaintiffs Elieser Yael Velásquez, Sergio Velásquez, Humberto Berrocal and Freddy Vasquez.

623.     Defendants acted recklessly or with the intent of causing Plaintiffs Elieser Yael Velásquez, Sergio Velásquez, Humberto Berrocal and Freddy Vasquez severe emotional distress.

624.     Moreover, Defendants' actions were willful and wanton in that they committed such actions purposefully or they must have realized that their actions were done heedlessly and recklessly, without regard to the consequences or to the rights of Plaintiffs Elieser Yael Velásquez, Sergio Velásquez, Humberto Berrocal and Freddy Vasquez.

625.     On information and belief, Defendants had a tacit understanding to consciously conspire and deliberately pursue a common plan or design that resulted in these wrongful actions against Plaintiffs Elieser Yael Velásquez, Sergio Velásquez, Humberto Berrocal and Freddy Vasquez, pursuant to Colo. Rev. Stat. § 13-21-111.5(4).

626.     As a result of Defendants' wrongful actions and omissions, Plaintiffs Elieser Yael Velásquez, Sergio Velásquez, Humberto Berrocal and Freddy Vasquez have suffered severe emotional distress.

## TENTH CLAIM FOR RELIEF

### (Promissory Estoppel Claim Against Defendants)

627.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 626 as set forth above.

628.    Defendants made promises to Plaintiffs about their work in the United States on the H-2A visa.

629.    Defendants should have reasonably expected that their promises would induce action and/or forbearance by Plaintiffs.

630.    Plaintiffs were induced to act and/or refrained from acting based on their promises made by Defendants.

631.    Defendants broke their promises to Plaintiffs.  As a result, Plaintiffs suffered injuries.

632.    Injustice can only be avoided by the enforcement of Defendants' promises.

## DEMAND FOR JURY TRIAL

633.    Plaintiffs demand a jury for all issues so triable.

## PRAYER FOR RELIEF

634.    Plaintiffs respectfully request that this Court enter an order:

a)      assuming jurisdiction of this case;

b)      declaring that Defendants violated the FLSA and awarding Plaintiffs their unpaid minimum and/or overtime wages and a like amount as liquidated damages;

c)      declaring that Defendants violated the TVPRA and awarding the relevant Plaintiffs damages;

d)      declaring that the Dickinson Defendants violated RICO, 18 U.S.C. § 1962(c) and/or 18 U.S.C. § 1962(d) and awarding Plaintiffs treble damages pursuant to 18 U.S.C. § 1964(c);

e)      declaring that Defendants violated the Colorado Wage Claim Act and awarding the relevant Plaintiffs penalties under the Colorado Wage Claim Act;

f)      declaring that Defendants breached their contract with Plaintiffs and awarding Plaintiffs damages flowing from the breach;

g)      declaring that Defendants falsely imprisoned Plaintiffs and awarding Plaintiffs damages;

h)      granting a declaratory judgment against Defendants on the relevant Plaintiffs' claims of extreme and outrageous conduct and awarding the relevant Plaintiffs damages;

i)      granting a declaratory judgment against Defendants on Plaintiffs' claims of promissory estoppel and awarding Plaintiffs damages;

j)      awarding Plaintiffs costs;

k)      awarding Plaintiffs prejudgment and post-judgment interest; and

l)      granting such other relief as this Court deems just and proper.

This 19th day of July 2006.

                                     Respectfully Submitted,

                                 s/Kimi Jackson_____

Kimi Jackson
**Colorado Legal Services**
**Migrant Farm Worker Division**
424 Pine Street, Suite 105
Fort Collins, CO  80524-2421
Tel. (970) 407-7018
Fax (970) 493-3758
kjackson@colegalserv.org


  s/Jennifer J. Lee_____ _____
Jennifer J. Lee
**Colorado Legal Services**
**Migrant Farm Worker Division**
1905 Sherman Street, Suite 400
Denver, CO 80203
Tel. (303) 866-9366
Fax (303) 830-7860
jlee@colegalserv.org


  s/Patricia Medige_____ _____
Patricia Medige
**Colorado Legal Services**
**1905 Sherman Street, Suite 400**
Denver, CO 80203
Tel. (303) 866-9366
Fax (303) 830-7860
pmedige@colegalserv.org


**Attorneys for Plaintiffs**

**Certificate of Service**

I hereby certify that on July 20, 2006, I electronically filed the foregoing with the Clerk of Court using the CM/EFC system which will send notification of such filing to the following e-mail addresses:

lschluter@lawincolorado.com
mshowalter@lawincolorado.com
jlee@colegalserv.org
pmedige@colegalserv.org
kwalker@colegalserv.org
kjackson@colegalserv.org

   s/Kimi Jackson_____
Kimi Jackson
Attorney for Plaintiffs
**Colorado Legal Services**
**Migrant Farm Worker Division**
424 Pine Street, Suite 105
Fort Collins, CO  80524-2421
Tel. (970) 407-7018
Fax (970) 493-3758
kjackson@colegalserv.org